Reginald A. SOOLOOK, Appellant,

v.

STATE of Alaska, Appellee.

No. 908.

Supreme Court of Alaska.

Nov. 8, 1968.

Millard F. Ingraham, Fairbanks, Joseph H. Shortell, Anchorage, for appellant.

Russell J. Gallagher, Asst. Dist. Atty., Anchorage, Fred D. Crane, Dist. Atty., Nome, for appellee.

Before NESBETT, C. J., and DIMOND, and RABINOWITZ, JJ.

## OPINION

RABINOWITZ, Justice.

After trial by jury Reginald Soolook was found guilty of the crime of murder in the second degree.[1] Appellant was thereafter sentenced to life imprisonment. The primary issue in this appeal involves the trial court's admission into evidence of two separate confessions which were made by appellant. It is argued that these confessions should have been excluded because prior to appellant's confessions the law enforcement authorities involved failed to comply with the criteria announced in Miranda v. State of Arizona.[2]

The record shows that on the morning of February 7, 1966, Hannah Teayoumeak was found dead in the snow behind a bowling alley at Nome, Alaska. After a joint investigation which was conducted by the Nome City Police and the Alaska State Police, the district attorney of Nome signed a complaint which charged appellant with the first degree slaying of Hannah Teayoumeak. On the basis of this complaint a warrant for appellant's arrest was issued by the district magistrate in Nome.

Thereafter, Trooper Lowell Parker of the Alaska State Police and Homer Throne, Chief of Police of the city of Nome, flew

---

1. An indictment had been returned charging appellant with the first degree murder of Hannah Teayoumeak.

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, 10 A.L.R.3d 974 (1966).

to Teller to arrest appellant.[3] After their arrival in Teller the officers proceeded to the home of appellant's parents where they were informed that appellant was down the street visiting at a friend's home. Trooper Parker testified that he located appellant and stated, "I asked Mr. Soolook if he was Reginald Soolook and he said, 'yes.'" Trooper Parker further stated that he then asked appellant if he had returned from Nome yesterday or the day before and that after appellant answered affirmatively, appellant was requested to accompany the two officers back to the elder Soolook's residence.

After returning to the Soolook home the following occurred, according to Trooper Parker's testimony:

I advised him of the fact that he did not have to talk to us if he didn't wish to, that he could have a lawyer and that whatever he said could be used against him * * *

* * * * * *

I asked Mr. Soolook if he understood what I meant when I had advised him, he said yes he understood.[4]

According to Trooper Parker, appellant then asked both the Chief of Police of Nome and Parker himself if they would step into the bedroom as appellant wanted to talk to them in private. Once in the bedroom appellant was asked by Trooper Parker if he had killed Hannah Teayoumeak. Appellant then admitted that he had. At this point Trooper Parker handed appellant a copy of the warrant and placed him under arrest.

Appellant then gathered several items of luggage from his bedroom and

walked out into the living room and * * * told his father and step-mother that he had something he would like to tell them. So his father was sitting on the bed. He went over to his father and says I killed Hannah and broke down and started crying.[5]

Officers Parker and Throne, together with appellant, then returned to Nome in a light aircraft the officers had previously chartered. During this flight, Trooper Parker asked appellant what he had used to kill Hannah and appellant informed him that he had used a knife. In response to Parker's further questions, appellant stated he had thrown the knife away and would show them the area where he had disposed of the knife. Upon arrival at Nome, appellant pointed out the area where he had thrown the knife. Appellant was then taken directly to the district attorney's office in Nome.

Fred D. Crane, district attorney for the Second Judicial District, testified that upon meeting appellant in his office he advised appellant

that he did not have to make any statements at this time. I advised him that he had the right to remain silent now any time during the proceedings. I particularly advised him that he had a right to an attorney at this time or during any of the proceedings. I further told him that if he was unable to get an attorney that an attorney would be appointed for him. I asked him if he completely understood his rights, his answer was yes.[6]

After a short interval of time, appellant said, "Oh, well, I might as well tell you about it now." Appellant was then interrogated by Officers Parker, Throne, and

---

3. The authorities' investigation had revealed that appellant had left Nome by Wien Airlines for Teller on the same morning that the body of Hannah Teayoumeak was discovered.
   Teller is located on the Seward Peninsula approximately 60 miles from Nome.

4. At the preliminary hearing which was held on March 8, 1966, Trooper Parker testified in part that he "advised the

subject of his rights as to a lawyer, he was not compelled to say anything * * *."

5. This is Trooper Parker's uncontradicted version of the events which transpired in the living room.

6. Present at this time in the district attorney's office, in addition to Mr. Crane and appellant, were Mr. Crane's secretary, Trooper Parker, and Chief Throne.

the district attorney. In this interrogation appellant confessed to the murder of Hannah Teayoumeak. After the confession was transcribed by the district attorney's secretary, appellant asked the district attorney to "go down and see Hannah's father and mother and tell them I'm sorry I killed Hannah."

Prior to trial appellant's counsel moved to suppress these confessions, as well as certain physical evidence, on the grounds that this evidence had been obtained without appellant's having been advised of his rights as required by Miranda v. Arizona[7] and without appellant having knowingly and intelligently waived these same rights. Additionally, appellant asserted that this evidence should have been suppressed because it represented the poisoned fruit of an unlawful arrest. In appellant's view the arrest was illegal because the complaint itself did not disclose that it was issued upon probable cause.

The superior court ruled inadmissible the oral confession given at Teller to Officers Parker and Throne on the ground that appellant had not been advised that if he was indigent an attorney could be appointed to be present and represent him during any police interrogation; that the confession made to appellant's father and step-mother in the presence of Officers Parker and Throne was admissible because it was a voluntary statement and not the result of any police interrogation; and that the confession given to the district attorney at Nome was admissible because prior to its utterance appellant had been properly advised of his Miranda rights and had knowingly and intelligently waived them. During the course of the trial which took place in July 1967 at Nome, a mistrial was declared and the case was reset for trial at Anchorage on August 7, 1967. Prior to the actual taking of evidence, the trial court made similar rulings to the ones it had

previously made in regard to appellant's confessions. At the second trial, the prosecution introduced into evidence the confessions made by appellant to his parents in the presence of the police officers, as well as the confession given to the district attorney at his office in Nome.

Miranda v. Arizona,[8] which was decided approximately four months after appellant had made the two confessions in question, established constitutional criteria for the admissibility of statements obtained during custodial police interrogation. In Miranda the Supreme Court of the United States held that

the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

Two years before Miranda the Supreme Court of the United States reversed a conviction for murder in Escobedo v. State of Illinois.[9] In reaching this result the court held that:

[W]here * * * the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance

7.  384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

8.  Id. at 444, 86 S.Ct. 1602, 1612, 16 L.Ed. 2d 694, 10 A.L.R.3d 974.

9.  378 U.S. 478, 490–491, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977, 986 (1964).

of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment' * * *.

■ Prior to the trial of this matter, the Supreme Court of the United States held in Johnson v. State of New Jersey [10] that neither *Escobedo* nor *Miranda* would be given retroactive application. The court ruled that *Escobedo* was to be applicable only to those cases in which the trial began after June 22, 1964, and that *Miranda* would govern trials begun after June 13, 1966. In Martinez v. State,[11] this court adopted *Johnson's* holding as to the timing of the applicability of both *Escobedo* and *Miranda*. Since appellant's trial took place in the summer of 1967, it follows that both *Escobedo* and *Miranda's* rules are apposite.

Our review of this appeal has led us to the conclusion that the trial court did not commit error in holding the two confessions admissible. Under the pre-*Escobedo* and *Miranda* "totality of the circumstances" [12] test, there is no question that appellant's two confessions were voluntary and therefore properly admissible into evidence. Here there is no evidence of employment by the police of physical or psychological coercion against appellant. Nor are we presented with a record which discloses prolonged custodial police interrogation. Further, there is no indication that any deception was employed by the law enforcement officials in order to elicit a confession from appellant. What is significantly omitted here is that prior to the bedroom confession in Teller, and prior to the subsequent confession by appellant to his father, appellant had not been advised that he had the right to the presence, at any police interrogation, of an appointed attorney. The factual crux of the case is that Trooper Parker's initial warning to appellant fell short of the requirements mandated by the *Miranda* decision, although the warning actually given to appellant met the criteria enunciated by *Escobedo* which represented the controlling law at the time of Trooper Parker's warning.

Turning first to the question of the propriety of the trial court's ruling permitting the introduction into evidence of the confession appellant made to his father and step-mother, we are of the opinion that the court's ruling can be sustained upon the authority of Copeland v. United States.[13] There the police had obtained damaging admissions from the defendant as a result of an unlawful interrogation and line up. The pertinent facts were described by the court as follows:

At approximately 9 A.M., appellant confessed to [detective] Evanoff that he had robbed the paint store. Meanwhile, police had arranged to have one of the paint store robbery victims, Mr. Kuck, come to the police station. Kuck arrived there at about 9:20 and as he walked into the police station, appellant stood up, 'put out his hand and apologized * * *' to Kuck for the shooting during the paint store robbery.[14]

In *Copeland* the appellant contended that allowance of evidence of this apology at trial was error because it was tainted by the previously obtained inadmissible confession. In holding contrary to appellant's contention, the court said:

We can only speculate whether appellant would have apologized to Kuck absent prior interrogation by Evanoff and confession of the crime. Whatever the force of the 'cat-out-of-the-bag' argument in determining a nexus between two succes-

10. 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966).

11. 423 P.2d 700, 706–707 (Alaska 1967).

12. Clewis v. State of Texas, 386 U.S. 707, 709, 87 S.Ct. 1338, 18 L.Ed.2d 423, 426 (1967); Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Haynes v. State of

Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Fikes v. State of Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246, 251 (1957).

13. 120 U.S.App.D.C. 5, 343 F.2d 287 (1964).

14. Id. at 289 (footnotes omitted).

sive confessions to police, it would seem to have none as to a spontaneous, unsolicited and unexpected comment addressed only to a victim. An apology to a private citizen is a different breed of 'cat' from the kind involved in a statement to police.[15]

■ In the course of its opinion, the *Copeland* court emphasized the importance of appellant's statement being in the nature of "a gratuitous expression of remorse freely given."[16] Appellant's emotional confession to his father and step-mother can be described in terms similar to those employed by the *Copeland* court. In the case at bar there are even fewer coercive factors present than in *Copeland* since here there had been no previous periods of formal interrogation similar to the type described by the Supreme Court in *Miranda*. Here the confession was made in appellant's own home as opposed to the police station situs in the *Copeland* case. We hold that under the rationale of the *Copeland* case appellant's unsolicited, spontaneous, and emotional confessional statement was admissible despite the incomplete *Miranda* warning which was

given just a few short minutes preceding this confession.[17]

■ In *Miranda* the court made the following comments concerning voluntary statements:

In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.[18]

---

15. Id. at 291 (footnote omitted). In writing for the court, Mr. Justice Jackson said in United States v. Bayer, 331 U.S. 532, 540–541, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660 (1947):

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

See also Justice Harlan's separate opinion in Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630, 634–635 (1968).

16. Copeland v. United States, 120 U.S. App.D.C. 5, 343 F.2d 287, 291 n. 3 (1965).

17. In regard to this confession, the trial court ruled:

The second so called statement made in this case is the one in which the defendant allegedly told his father that he killed Hannah. I find * * * that this was strictly a voluntary statement by the defendant in speaking to his father and stating that 'I killed Hannah.'

* * * * *

* * * and the warnings as set out in Miranda v. Arizona is not applicable and that the true test is whether or not the statement was made voluntarily since the statement was not made or solicited through interrogatories or questions by the police * * *. Therefore I conclude that this statement is admissible as a voluntary statement and the rules of law applying to voluntary statements are applicable to this statement.

18. Miranda v. State of Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed. 2d 694, 726, 10 A.L.R.3d 974 (1966) (footnote omitted).

■ Here we hold that appellant's confession to his parents was not the product of custodial interrogation [19] but one which was given freely and voluntarily within the meaning of the *Miranda* and *Copeland* decisions.[20]

■ We turn next to the full confession which was obtained from appellant after he had been returned to Nome and interrogated by the district attorney. Again there is no doubt that the events leading up to and encompassing the actual interrogation came within the ambit of the Supreme Court's definition of "custodial interrogation." Thus, we have a situation in which the warnings mandated by *Miranda* are prerequisite to the admissibility of any statements made by appellant during this custodial interrogation by the law enforcement officials. An additional prerequisite to the admissibility of any statement by appellant is that it must be shown appellant waived effectuation of the rights embodied in the full *Miranda* warning. For as the Supreme Court said in *Miranda*:[21]

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. * * *

* * * * * *

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intellingently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * *

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

■ Here examination of the record discloses that the district attorney did in fact give appellant the full warning required by *Miranda*. Our review of the record discloses that there is ample evidence to support the trial judge's conclusion that appellant voluntarily, knowingly, and intelligently waived his privilege against self-incrimination and his right to

---

19. In Miranda v. State of Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706, 10 A.L.R.3d 974 (1966), the court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." On the facts of this record, there is no question that Officer Parker's initial questioning under the circumstances came within the Supreme Court's definition of "custodial interrogation."

20. There are numerous authorities to the effect that volunteered statements not made as a result of police interrogatories, or made to persons other than law enforcement officials or their agents are admissible despite the absence of any *Miranda* warnings. Evalt v. United States, 359 F.2d 534 (9th Cir. 1966); Stowers v. United States, 351 F.2d 301 (9th Cir. 1965); United States v. Gardner, 347 F.2d 405 (7th Cir. 1965), cert. denied, 382 U.S. 1015, 86 S.Ct. 626, 15 L.Ed.2d 529 (1966); Dixon v. Bailey, 246 F.Supp. 100 (E.D.N.C.1965); Campbell v. State, 4 Md.App. 448, 243 A.2d 642, 643 (1968); State v. Little, 201 Kan. 94, 439 P.2d 387, 391 (1968); Stone v. State, 442 P.2d 519, 524 (Okla. Crim.1968).

In the *Little* case the accused had been arrested and taken to the establishment where the check offense was alleged to have taken place. There the shopkeeper asked whether or not the accused was the person who had given her the $95 check in question. The accused had replied, "Yes, Ma'm I am." In these circumstances the court said:

> Defendant's reply was equally spontaneous and voluntary and was not in response to any question directed to him by the officer. In fact, the admission was wholly unsolicited so far as the officer was concerned.

21. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 1612, 1628, 16 L.Ed. 2d 694, 707, 724 (1966).

the presence of either retained or court-appointed counsel at the interrogation.[22]

Despite the foregoing, appellant contends that the trial court should have excluded the confession he made to the Nome district attorney because it was tainted by the interrogation and confessions which occurred prior to his having received the complete *Miranda* warning. For the proposition that the district attorney's interrogation of appellant was "tainted" by virtue of the incomplete *Miranda* warning which was followed by improper questioning by Officer Parker and Chief Throne, appellant relies on the authority of Westover v. United States,[23] a companion case to *Miranda*.

In *Westover* the defendant had been subjected by the Kansas City Police to a lengthy interrogation which was not preceded by any warnings. This interrogation proved fruitless; whereupon the police turned defendant over to FBI agents who questioned him about a separate and distinct offense to which he voluntarily confessed. This second period of interrogation was preceded by adequate warnings. On the basis of that record, the Supreme Court held that:

> At the time the FBI agents began questioning Westover, he had been in custody for over 14 hours and had been interrogated at length during that period. The FBI interrogation began immediately upon the conclusion of the interrogation by Kansas City police and was conducted in local police headquarters. Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. * * * Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed.

> * * * A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege.[24]

In our view the factual situation in the case at bar is distinguishable from *Westover*. Unlike *Westover*, Officers Parker and Throne did give appellant a warning which was fully in accord with *Escobedo*—

---

22. Relative to the question of appellant's ability to intelligently understand the full meaning of his constitutional rights, the court found as follows:

    The defendant is an intelligent, 21 year old native boy who has finished high school at Mt. Edgecumbe, Alaska, and in a class of 160 finished 4th just short of being Valedictorian. His appearance and demeanor in court were good and he appears to be above the average in intelligence of a person who had a high school and some college and technical training. I find that the defendant, after being adequately warned of his rights thought about the matter and volunteered a statement after it was suggested to him that he give the matter some thought. The defendant made this statement voluntarily 'Oh well, I might as well tell you now.' The defendant was calm during these statements, he was not excited, his actions as well as his words clearly and affirmatively show that defendant affirmatively waived his privilege against self-incrimination and his right to a retained or appointed attorney.

23. 384 U.S. 436, 494–497, 86 S.Ct. 1602, 16 L.Ed.2d 694, 735–736 (1966).

24. Westover v. United States, 384 U.S. 436, 495–497, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694, 735–736 (1966).

the applicable law at the time.[25] In contrast to *Westover,* here there was no lengthy custodial interrogation of appellant. The record discloses that at most four or five questions were asked of appellant from the time the *Escobedo* warning was given until the time the district attorney advised appellant of his rights in accordance with the *Miranda* criteria.[26] From our study of the record, it appears that the period of actual interrogation before appellant admitted that he killed Hannah consumed only a few minutes.[27] In *Westover* the United States Supreme Court emphasized that they viewed the "impact" on appellant as one of a "continuous period of questioning."[28] Further, in *Westover* the court specifically found that the FBI agents were the "beneficiaries of the pressure" applied by the first interrogators. Here we cannot characterize the events which occurred prior to the giving of the district attorney's *Miranda* warning as having the impact upon appellant of one continuous period of questioning.

Nor do we find that the *Bayer*[29] cat-out-of-the-bag rationale required the exclusion of appellant's confession to the district attorney. We have previously alluded to the fact that in *Bayer* the Supreme Court did state that once the secret is out an accused can never return the cat to the bag, and that, "In such a sense, a later confession always may be looked upon as fruit of the first." Additionally, the Supreme Court went on to state that:

[T]his Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.[30]

Assuming that the officer's failure to give appellant the full *Miranda* warning in the bedroom in Teller precluded the use of appellant's admission that he had committed the slaying, we believe the facts here present a situation in which appellant was not disabled from making a usable confession once the omission of the right to the presence of court-appointed counsel portion of the *Miranda* warning had been rectified.[31] In our view the cat-out-of-the-bag rationale is too tenuous and speculative a basis upon which to establish a tainted or poisoned fruit nexus between that of appellant's initial confession and the one he made to the district attorney in Nome.

25. In *Westover* the Supreme Court states in part that, "There is nothing in the record to indicate that Westover was ever given any warning as to his rights by local police." Westover v. United States, 384 U.S. 436, 495, 86 S.Ct. 1602, 1638, 16 L.Ed.2d 694, 735 (1966).

26. Appellant was asked the following questions: If he had been in Nome the day before? If he knew Hannah? When was the last time he had seen Hannah? If he killed Hannah? What weapon did he use to kill Hannah?

27. Unlike *Westover*, this question occurred in appellant's own home and in appellant's own bedroom.

28. The opinion at this point reads: Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. There is no evidence of any warning given prior to the FBI interrogation nor is there any evidence of an articulated waiver of rights after the FBI commenced its interrogation. The record simply shows that the defendant did in fact confess a short time after being turned over to the FBI following interrogation by local police.
Westover v. United States, 384 U.S. 436, 496, 86 S.Ct. 1602, 1639, 16 L.Ed. 2d 694, 736 (1966). As we have already pointed out in the case at bar Officer Parker did give appellant a warning which met the requirement of *Escobedo*. After the district attorney had given a warning in conformity with the *Miranda* case, the record shows that appellant voluntarily, knowingly, and intelligently waived his privilege against self-incrimination and his right to the presence and assistance of retained or appointed counsel.

29. United States v. Bayer, 331 U.S. 532, 540–541, 67 S.Ct. 1394, 91 L.Ed. 1654, 1660 (1947).

30. Id.

31. Compare Evans v. United States, 375 F.2d 355 (8th Cir. 1967).

Additionally, we believe that the trial court's ruling in regard to the confession made to the district attorney is sustainable for the following reasons. As we have already noted, appellant's first confession, which was excluded by the trial court, immediately followed a warning as to his rights. This warning was in full accord with the then prevailing and applicable standards, i. e., namely, *Escobedo*. Appellant's initial confession was not the product of any physical or psychological coercion whatsoever on the part of the law enforcement officers, nor was it the product of long periods of custodial interrogation conducted within a hostile custodial environment. The circumstances which preclude use of appellant's first confession, which was made to the officers in his bedroom in Teller, were accidental. This accidental quality arises from the fact that appellant's trial was held after *Miranda* was decided and after *Johnson*,[32] which decision made *Miranda* applicable in the determination of the merits of this case. Yet, the initial warning which was given to appellant took place before *Miranda* had been decided and at the time it was given fully complied with the then controlling mandate of *Escobedo*. As to the subsequent confessions which appellant made, again there is nothing in the total circumstances of this record which discloses that any physical or psychological coercion was exerted by the officers against appellant, nor is there any element of unreliability or involuntariness in regard to any of appellant's confessions here involved. Under the particular facts of this record, we are persuaded that the rationale of the Supreme Court of Nevada's decision in Guyette v. State,[33] should be followed. In circumstances not dissimilar from the case at bar, the *Guyette* court held that failure to advise the accused of his right to the presence of counsel, either retained or appointed, con-

stituted harmless error. There the court said:

Although the High Court has not yet ruled that the doctrine of harmless error may be applied to a Miranda warning violation, the drift of its opinions would suggest that the rule of harmless error may be utilized when any of the new procedural safeguards, as expressed in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, [84 A.L.R.2d 933] (1961); Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, [10 A.L.R.3d 974] (1966); and Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), are breached. We say this mainly because the constitutional doctrines of those cases were not given retrospective application, apparently for the reason that a violation may occur without necessarily affecting the fundamental fairness of the trial. Due process in the traditional sense is not necessarily denied the accused. The very integrity of the fact finding process is not necessarily infected by the violation. The reliability of the evidence received is not necessarily suspect. Hence, the rule of 'automatic reversal' does not control appellate disposition.

\*　\*　\*　\*　\*　\*

We turn, then, to articulate why we deem the procedural default (the failure to advise the defendant of his right to the presence of counsel, either retained or appointed) harmless in the context of this case. First, there is not the slightest suggestion that the statements were coerced in any manner whatsoever. The defendant testified that his confession of April 27 was voluntarily given, and did not indicate that any of his other utter-

---

32. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

33. 438 P.2d 244 (Nevada 1968).

ances were other than voluntary. Neither at trial nor in this court did his counsel assert that the responses to interrogation were involuntary. The thrust has always been that appropriate protective warnings were not given. It seems to us that the basic test of reliability was met in this case. Second, the law in effect when the interrogations occurred was complied with. Consequently, any concern to deter unlawful police activity is not involved here. Finally, we note that perhaps the most damning evidence (the April 7 admissions and the April 27 confession) was volunteered, not in response to interrogation, and, therefore, untouched by the Miranda doctrine. State v. Billings, 84 Nev. ——, 436 P.2d 212 (1968).[34]

█ Adopting *Guyette* we hold that assuming it was error to admit into evidence appellant's confessions, the error was harmless and does not require the setting aside of the judgment and commitment which was entered in this case.

Appellant's final point is that the court below erred in denying his motion to suppress all confessions or admissions made by him, as well as certain tangible evidence which was taken from his possession. Appellant argues that suppression of this evidence was mandated because it was obtained as the result of an unlawful arrest.

The complaint upon which the warrant for appellant's arrest issued was signed by the Nome district attorney. After alleging the elements of the crime of murder in the first degree, the following information appeared in the complaint:

This complaint is based on the investigation of the Nome City Police and the Alaska State Police.

█ The gist of appellant's argument is that under Giordenello v. United

States,[35] Aguilar v. State of Texas,[36] and our Criminal Rule 4(a)[37] the requisite factual basis for issuance of a warrant for appellant's arrest did not appear in the text of the complaint. In Merrill v. State[38] we said:

In deciding whether or not the .22-caliber revolver was obtained as the result of an illegal search and seizure, we find it unnecessary to pass upon the question of whether the complaints in question were constitutionally sufficient for purposes of determining the existence of probable cause. Giordenello v. United States, is authority for the proposition that the prosecution may justify appellants' arrests without relying on the validity of the warrants. If appellants' arrests can be validated apart from the questioned warrants, then the revolver, which was seized incident to their arrests, was admissible.

In Goss v. State[39] we said in part that: Since the arrest, in this case was also made without a warrant, its lawfulness depends on whether it was based on probable cause, which exists if the facts and circumstances known to the officer would warrant a prudent man in believing that an offense had been or was being committed.

We adopt the approach that we have heretofore taken in *Merrill* and *Goss* and conclude that it is unnecessary to decide whether or not the complaint here was constitutionally infirm. We hold appellant's arrest valid apart from any considerations concerning the sufficiency of the complaint.

█ AS 12.25.030(3) of our Code of Criminal Procedure provides that a peace

34. Id. at 248–249 (footnote omitted).

35. 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed. 2d 1503 (1958).

36. 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

37. Crim.R. 4(a) (1) provides:
If it appears from the complaint that there is probable cause to believe that

an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it.

38. 423 P.2d 686, 698–699 (Alaska 1967) (footnotes omitted).

39. 390 P.2d 220, 223 (Alaska 1964) (footnote omitted).

officer may arrest a person without a warrant "when a felony has in fact been committed, and he has reasonable cause for believing the person to have committed it." Our study of the record leads us to the conclusion Officers Parker and Throne had probable cause to arrest appellant at the time they actually took him into custody. In short, the facts and circumstances known to these officers prior to appellant's arrest warranted a prudent man in believing that an offense had been committed, and that appellant was the perpetrator of the crime.[40]

The factual circumstances preceding the issuance of the warrant for appellant's arrest were as follows: On February 7, 1966, Chief Throne received a telephone call from a Mr. Carl Glavinovich requesting him to come to the bowling alley. Chief Throne responded to the call and found the body of a young girl lying behind the city water tank. A Mr. Tony Martin, in Chief Throne's presence, identified the body as that of Hannah Teayoumeak. The body appeared to have been severely beaten and perhaps raped. Nome City Policeman Charles Wilson, who was present at the scene, told Chief Throne that the body resembled that of a girl he had seen earlier that morning in the company of a youth whom the officer believed to be a Nome vocational school student. Chief Throne then dispatched two officers to the vocational school in an effort to uncover the identity of the youth who was with the victim earlier that morning. Chief Throne testified that:

State Trooper Parker returned with the information that he had gathered at the school from various people he had talked to that a Reginald A. Soolook was seen that evening * * * with this young lady. I then immediately called Wien Airlines to see where, if this party by the name of Soolook had left and they informed me a Roger Soolook left at 9 o'clock on February 7th for Teller, Alaska. Also, State Trooper Parker informed me that Mr. Soolook was staying at Kulukhon's residence. We later went up there and it was verified.

Officer Parker testified that as a result of the investigation which was conducted at the Nome Vocational School the authorities had ascertained appellant's name, the fact that he was from Teller, and details as to his whereabouts earlier that morning and the prior evening, "and the people who had seen them together and had been with them the night before." Officer Parker further testified as a result of this investigation they had learned appellant had returned to the Kulukhon's residence, where he was staying while in Nome, at 3:30 or 4 a. m. on the morning in question.

On the basis of the foregoing, we are of the opinion that Officers Parker and Throne had probable cause to arrest appellant for the murder of Hannah Teayoumeak.[41]

The judgment and commitment entered below is affirmed.

---

40. Goss v. State, 390 P.2d 220, 223 (Alaska 1964), where in regard to the definition of probable cause we cited Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134, 138 (1959). In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327, 332 (1959), the Supreme Court quoted from Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949):

'In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical. They are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'

41. In United States v. Cooperstein, 221 F.Supp. 522, 526 (D.Mass.1963), Judge Wyzanski wrote:

*Ordinarily when the trustworthy evidence makes it clear that an offense has been committed and that a particular person was on the scene at the time it was committed, and the then available evidence makes it reasonable to infer that the particular person not necessarily was but may have been one of the offenders, most discreet and prudent men would order that person's arrest.*

See People v. Felli, 156 Cal.App.2d 123, 318 P.2d 840, 842 (1958); Booze v. State, 390 P.2d 261 (Okla.Crim.1964).