UNITED STATES *v.* BAYER ET AL.

No. 606. Argued April 2, 1947.—Decided June 9, 1947.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Robert S. Erdahl* and *Beatrice Rosenberg.*

*Charles H. Tuttle* argued the cause for Bayer et al., respondents. With him on the brief were *Joseph B. Keenan, I. Maurice Wormser* and *Archibald Palmer.*

*Roger Robb* argued the cause for Radovich, respondent. With him on the brief was *Samuel T. Ansell.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

This is a sordid three-sided case. The Government charged all of the defendants with conspiring to defraud by depriving it of the faithful services of an Army officer. 18 U. S. C. § 88, 35 Stat. 1096. The defendant Radovich, the officer in question, admits receipt of money from the other defendants and admits the questioned actions but denies the conspiracy, claiming the others induced him to accept a bribe. The defendants Bayer admit payment of the money but claim they were victims of extortion by Radovich. The jury found all guilty but recommended "the highest degree of clemency for all three defendants." The Court of Appeals for the Second Circuit reversed.[1] We granted the Government's petition for certiorari.[2]

---

[1] *United States* v. *Bayer,* 156 F. 2d 964.

[2] 329 U. S. 706.

The principal facts are admitted and it is contested inferences which are decisive of the issue of guilt. None of the defendants testified. It would serve no purpose to review the evidence in detail. It justifies finding as follows:

The Bayer brothers were manufacturers of yarn and thread and bore good names in their circle. Samuel had three sons in the service. One of them, Martin, with Melvin Usdan, a nephew of both Bayers, was involved in this case. Martin's health had not been robust. These two boys enlisted in the Air Corps on the day which Samuel had learned was the last on which a volunteer could select the branch in which to serve. They were almost immediately assigned as file clerks at Mitchel Field, Long Island. In January 1943, at a night club, Elias Bayer picked up the acquaintance of two officers stationed there. They were interested in obtaining uniforms at wholesale. The Bayers eventually aided them and others to obtain uniforms and paid for them, though they claim to have understood that the officers were to pay for them. The acquaintance extended to other officers, and there was considerable entertainment. In April 1943 replacement of men in clerical positions by Women's Army Corps personnel was impending and one Col. Jacobson requested a transfer of these two boys with the effect, as Samuel understood it, of assuring them a year's assignment at Mitchel Field. Jacobson was given a dinner at the Waldorf and presented with four new automobile tires.

This transfer placed the two boys under command of Radovich. By July there were rumors that the officers were receiving gifts from the Bayers and Radovich told Samuel that the boys would have to be transferred. Samuel wanted them kept at Mitchel Field. Radovich made a transfer from his unit to the medical detachment at the same field, which at first was disapproved, and then

he accomplished it by an exchange of personnel. After the transfer was made, Samuel paid Radovich some $1,900 or $2,000.

In August 1943 the boys were again transferred, to a unit of airborne engineers for overseas duty. Both Bayers were greatly concerned about this and besought their friends among the officers to prevent it. Radovich had gone. He had joined an Air Commando group with high priority on personnel. But he several times talked with Captain Pepper, in charge of personnel, about transferring these boys from the overseas service to Air Transport Command for service only in continental United States. This could not be done. Then Radovich proposed to use his unit's higher priority to requisition the boys for it, to drop them as surplus, and thereupon to have them transferred to the Air Transport Command for domestic service. Pepper agreed this might be done. Radovich told Pepper it was "worth his while" to get it done and he would see that doing it was worth Pepper's while.

On November 22, 1943 Radovich requisitioned the transfer of the boys to his unit, to report November 25. Almost at once he also requested that they be transferred out of his unit and to Air Transport Command. This was effected shortly. Elias Bayer and one of name unknown to the record then delivered $5,000 to Radovich, who sent Pepper $500. Pepper testified that he destroyed the check.

The Government from these facts and other evidence draws, as did the jury, the inference of conspiracy. The Bayers say they were victims of extortion and there is evidence that Radovich used the transfer to his own unit, one of extremely dangerous mission for which these boys had neither training nor aptitude, to force money out of the Bayers. Radovich denies the conspiracy and pleads certain court-martial proceedings as a bar.

The issue as to whether the Bayers tempted Radovich with a bribe or Radovich coerced them with threats is one with evidence and inferences both ways. Radovich was a gallant and skillful flier and explained his conduct thus: "I was going overseas on a very hot job and didn't expect to come back, had the wife and the baby, figured I might just as well take care of them." The Bayers were persons of some means, thoroughly frightened at the prospect of service for these boys in combat areas, and ready to use their means to foster the boys' safety. Whether they were victims of extortion or voluntary conspirators was for the jury to say, and the reversal does not rest on any inadequacy of proof. The grounds of reversal by the Court of Appeals raise for our consideration four questions of law.

1. The Bayers assigned as error the trial judge's charge as to conspiracy. The Court of Appeals unanimously said, "There is no question but that this charge was an accurate, albeit brief, statement of the law." But a majority thought that "the statement was so cryptic as to be difficult to understand, if not to be actually misleading to a jury of laymen," while one Judge thought it "a welcome relief from much judicial verbosity." [3] We are not certain whether a reversal as to the Bayers would have been rested on this criticism of the charge alone. We do not consider objection to the charge to amount to reversible error. Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse. How far any charge on technical questions of law is really understood by those of lay background would be difficult to

[3] 156 F. 2d at 967.

ascertain, but it is certainly more evident in the living scene than in a cold record. In this case the jury asked a rereading of the charge on conspiracy. After repeating his instruction, the court inquired of the jury whether anything about it was not clear, or whether there was anything which they desired to have amplified. Nothing was suggested, although inquiry was made as to other matters. While many judges would have made a more extended charge, we think the trial court was within its area of discretion in his brevity.

2. The Bayers won reversal on another ground. After the jury had been out about four hours, it returned for instructions and asked to have parts of the summations of counsel read. The court declined to read parts. It was at this point that counsel for the Bayers asked to reopen the case and to put in evidence a long distance call slip from telephone company records. It was the memorandum of a call on November 24, 1943, from one we assume to be Radovich, spelled on the ticket "Ravish," from Arlington, Virginia, to Bayer's number in New York. The ticket tended to corroborate Samuel Bayer's secretary who testified to receiving such a call and who was the Bayers' chief witness on the subject of extortion. It also tended to contradict a Government witness. The matter had become of importance because of the District Attorney's argument that the Bayers' witness falsified her story. The court had already, at respondents' request, after the jury had been instructed, told them that a check of the Bayers' records showed a collect-call from Washington that day, but on request of counsel for Radovich the court had also stated that the record did not show who made the call. We will assume that the proffered evidence was relevant, corroborative of the Bayers' contentions, and had the offer been timely and properly verified, its exclusion would have been prejudicial error.

But the item of evidence was disputed. The District Attorney had not seen the slip and did not admit the interpretation Bayer's counsel put upon it. Counsel for Radovich objected. To have admitted it over his objection might well have been prejudicial to him. The trial court had already, as he admitted, and as Radovich's counsel charged, given the Bayers the benefit of an irregular conveyance of information to the jury about the call which had not been regularly proved. Moreover, defendants offered no witness to authenticate the slip. As the trial court pointed out to counsel, his proposal was merely to hand to the jury "an unverified memorandum from the telephone company." Even during the trial such an offer, with no foundation in testimony and against objection, would have been inadequate. To have admitted it with no witness to identify or support it would have cut off all cross-examination by both the Government and Radovich, and cross-examination would not have been unreasonable concerning a slip in which the Bayers wished Arlington to be taken as equivalent to Washington and "Ravish" to identify Radovich. The evidence, if put in after four hours of deliberation by the jury, would likely be of distorted importance. It surely would have been prejudicial to the Government, for the District Attorney would then have had no chance to comment on it, summation having been closed. It also would have been prejudicial to the other defendant, Radovich, who, with no chance to cross-examine or to comment, would be confronted with a new item of evidence against him. The court seems to have faced a dilemma, either to grant a mistrial and start the whole case over again or to deny the Bayers' request. Certainly a defendant who seeks thus to destroy a trial must bring his demand within the rules of proof and do something to excuse its untimeliness.

Not only was the proffer of the evidence technically deficient, but no excuse for the untimeliness of the offer

appeared. It is true, no doubt, that counsel was surprised at the argument made by the District Attorney which would have been less effective had this evidence been in. But Miss Solomon, an employee of defendants and, hence, an interested witness, was left to carry the burden of proving extortion without the corroboration of the testimony of her employer-defendants. This was defendants' right, but it should have been apparent that every bolster to her credibility would be important. It is well known that the telephone companies keep such records and they seem to have been easily obtained when asked for. We do not consider it reversible error to refuse to let this unsworn, unverified slip be put into evidence four hours after the case had been submitted to the jury. The judgment of reversal as to the Bayers was, in our opinion, erroneous.

3. Radovich's case raises additional questions. The first concerns the receipt in evidence of his confession of March 15 and 17, 1945. In absence of the jury, the Court heard testimony before admitting it and thereafter most of it was repeated before the jury. The proof against Radovich largely rested on the confession.

After service of distinction in Burma, Radovich, then 24 years of age, was ordered to report to Mitchel Field. Upon arrival on August 9, 1944, he was placed under arrest and confined in the psychopathic ward in the station hospital. Here, for some time, he was denied callers, communication, comforts and facilities which it is needless to detail. Charges for court-martial were not promptly served on him as said to be required by the 70th Article of War, nor was he taken before a magistrate for arraignment on any charges preferred by civil authorities. Military charges were finally served on May 30, 1945. Meanwhile, under such restraint, he made a first confession on September 5 or 6, 1944. Without more, we will assume this confession to be inadmissible under the rule

laid down in *McNabb* v. *United States,* 318 U. S. 332, and *Anderson* v. *United States,* 318 U. S. 350. But this confession was neither offered nor received in evidence.

A second confession made to Agent Flynn of the Federal Bureau of Investigation on March 15 and 17, 1945 was received, however, and the Court of Appeals has held it to be "patently the fruit of the earlier one" [4] and equally inadmissible, citing *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Nardone* v. *United States,* 308 U. S. 338.

At the time of this confession Radovich was still at Mitchel Field, but only under "administrative restrictions," which meant that he could not depart the limits of the base without leave. Flynn testified that Radovich had a number of conversations with F. B. I. agents. He had volunteered some facts not in the original statement and the meeting of March was to incorporate the whole story in one statement. Flynn warned him his statement might be used against him. Radovich requested the original statement and read it before making the second. The March statement is labeled a "supplementary" statement and is "basically" the same as the earlier one but went into more detail. The District Attorney refused to produce the first statement, which was not offered in evidence, and the court sustained him, having examined the statement and found no material conflict between them.

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so

---

[4] 156 F. 2d at 970.

far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. The *Silverthorne* and *Nardone* cases, relied on by the Court of Appeals, did not deal with confessions but with evidence of a quite different category and do not control this question. The second confession in this case was made six months after the first. The only restraint under which Radovich labored was that he could not leave the base limits without permission. Certainly such a limitation on the freedom of one in the Army and subject to military discipline is not enough to make a confession voluntarily given after fair warning invalid as evidence against him. We hold the admission of the confession was not error. *Cf. Lyons* v. *Oklahoma,* 322 U. S. 596.

4. Lastly, we must consider whether the court-martial proceedings instituted against Radovich bar this prosecution on the ground of double jeopardy. Radovich was tried and, on June 29, 1945, convicted by court-martial of violating the 95th and 96th Articles of War, 10 U. S. C. §§ 1567, 1568, 41 Stat. 806–807. The offense charged and found was that of conduct unbecoming an officer and gentleman, and of conduct to the prejudice of good order and military discipline and of a nature to bring discredit upon the military service. As to each offense, the specifications set forth receipt of the same payments of money from the Bayers for effecting the same transfers that are involved in this indictment. Radovich's plea in bar was overruled by the trial court upon the ground that the conspiracy charged in the indictment was not the same offense as that under the Articles of War. The Court of Appeals disapproved this ground but left the issue of double jeopardy to be decided after retrial because of doubt meanwhile raised about the status of the military judgment.

The Court of Appeals thought the identity of the specifications in the court-martial proceedings and the offense charged in the indictment, and the likelihood that the military court did not distinguish carefully between the passing of the money and the arrangement to that end, required the plea in bar to be sustained under *Grafton* v. *United States,* 206 U. S. 333. In that case a soldier on guard duty in the Philippines shot and killed two Filipinos. He was tried by court-martial on charge of homicide and acquitted. A prosecuting attorney of the Islands then filed in Provincial Court a charge of "assassination" on identical facts. This Court found not merely the evidence but the offense charged to be identical in everything but name, and held retrial of the same offense in Philippine Courts to constitute double jeopardy.

But here we think the District Court correctly ruled that the two charges did not accuse of identical offenses. The indictment is for conspiring and we have but recently reviewed the nature of that offense. *Pinkerton* v. *United States,* 328 U. S. 640. Its essence is in the agreement or confederation to commit a crime, and that is what is punishable as a conspiracy, if any overt act is taken in pursuit of it. The agreement is punishable whether or not the contemplated crime is consummated. But the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself. *Pinkerton* v. *United States,* 328 U. S. 640, 644. In the court-martial proceedings, Radovich alone was accused. No conspiracy was alleged and the specification was confined to Radovich's receipt of money for effecting transfers. This was a substantive offense on his part under the Articles of War. The agreement with others to commit it constituted a separate offense, although among the overt acts proved to establish the conspiracy were the same payments and transfers. Both offenses could be

charged and conviction had on each. The plea in bar was properly overruled.

This conclusion makes it unnecessary to decide whether the disapproval of the court-martial judgment for errors in trial and without ordering retrial creates a status for the military judgment such that in no event would it be available to bar this prosecution.

The judgment of the Circuit Court of Appeals is reversed and that of the District Court is affirmed.

MR. JUSTICE FRANKFURTER would affirm the decision of the Circuit Court of Appeals substantially for the reasons set forth below by Judge Clark in reversing the conviction of the Bayers, which, under a charge of conspiracy, carries with it a reversal as to Radovich. 156 F. 2d 964, 967–68.

MR. JUSTICE RUTLEDGE is of the view that the judgment of the Circuit Court of Appeals should be affirmed insofar as it relates to the respondent Radovich, for the reasons stated in that court's opinion. 156 F. 2d 964, 968–70.