**UNITED STATES of America**

v.

**Arthur DAVIS et al., Defendants.**

**No. 71 Cr. 785.**

United States District Court,
S. D. New York.

March 30, 1972.

Whitney North Seymour, Jr., U. S. Atty., by David V. Keegan, Asst. U. S. Atty., New York City, for plaintiff.

Richard E. Bauman, New York City, for defendant Martin.

Joseph I. Stone, New York City, for defendant Galan.

PIERCE, District Judge.

## MEMORANDUM OPINION

The defendants [1] are charged with two counts of possession with intent to distribute and distribution of cocaine, a Schedule I narcotic drug, violations of 21 U.S.C. §§ 812, 841(a) (1), 841(b) (1) (A) and 18 U.S.C. § 2. Defendant Martin moves to suppress statements he made to police officers on the night of his arrest. He claims that his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were violated. He also moves to suppress the cocaine taken from his apartment on the grounds that such material was obtained as a direct result of police exploitation of their primary illegal conduct. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The testimony in this case is as follows. Defendant was arrested at approximately 9 p. m. on June 21, 1971 (Tr. 56, 74). He was driven directly to law enforcement offices at 201 Varick Street and arrived at 9:20 or 9:30 p. m. (Tr. 76; GX 4). There is no evidence that he was apprised of his rights during this drive (Tr. 83).[2] Defendant testified that shortly after arrival he was fingerprinted and photographed (Tr. 76). At this time he asked to see his attorney (Tr. 77, 82–83). The police did not comply with this request. He testified that the police began to question him between 9:30 and 10:00 p. m. (Tr. 80), but that he persisted in asking to see his lawyer, expressing this desire eight to ten times (Tr. 77). He refused to make a statement throughout the evening until 11:00 p. m. (Tr. 78, 80).

At this time he remembers being told he could refuse to sign the statement, but he nevertheless orally confessed to setting up a cocaine sale (Tr. 79). He testified that he made the statement because he was told an attorney would only take his money, and that he would be deported anyway (Tr. 78). He was also informed that if he made a statement he would be out of jail faster (Tr. 78, 79). He recalls being advised of his right to an attorney after he confessed, but prior to signing GX 5 (Tr. 83, 84, 88). When he asked to call his lawyer,[3] however, he was told he could not do so (Tr. 84, 85). He signed the statement anyway because he had "already told." (Tr. 84). Later that evening he executed a waiver of rights form and a consent to search his apartment (Tr. 79). At his interview the following morning with Assistant United States Attorney David Keegan he again indicated his desire to confer with his attorney (DX A), but he did not recall apprising Mr. Keegan of his such requests the previous evening (Tr. 86, 87, 91).

Sergeant Arthur Houlihan testified that he began to question defendant at 10:45 p. m., along with Detective Frank Jackson (Tr. 64). He said that he read defendant his rights from a card (GX 6) (Tr. 60) and inquired of defendant whether he desired to make a statement (Tr. 67). Houlihan recalled that defendant never requested to see his attorney before being questioned (Tr. 65), and further, that there was no discussion of deportation or the futility of calling a lawyer or the relationship of a low bail

---

1. There were orginally three defendants in this case but counsel for one defendant, Arthur Davis, has informed the Court that Davis has died of natural causes.

2. The government offered to have one of the officers who was present during this trip testify at the close of the hearing (Tr. 97), but the Court declined the proffer (Tr. 99). Earlier the government had specifically decided not to put this witness (Detective Fox) on the stand

(Tr. 71) and as a result he remained in the courtroom during defendant Martin's testimony and the closing arguments. The Court declined to permit Detective Fox to testify for this reason (Tr. 99). See note 6.

3. Defendant testified that he told the officers he knew his lawyer's telephone number from memory (Tr. 81). Upon inquiry by the Court he stated the number accurately from memory (Tr. 81, 82).

status to willingness to confess. (Tr. 66–67). Houlihan testified that at 11:00 p. m. defendant began to make a statement (Tr. 65); after the oral confession was completed, Detective Frank Jackson wrote it out in longhand (GX 5) (Tr. 64–65). Defendant signed the document at 11:45 p. m. as did Sergeant Houlihan and Detective Jackson. (Tr. 61). The record does not reflect that any waiver of rights form had been executed up until this time.

Detective James Nauwens testified that he first spoke with defendant around the time that Houlihan was completing his interrogation (Tr. 47). Nauwens stated that he advised defendant of his rights prior to questioning him (Tr. 45). He said that at 11:45 p. m. defendant volunteered to surrender a quantity of cocaine in his apartment (Tr. 54). Apparently, at this time the consent to search (GX 4) was typed. (Tr. 54). Subsequently defendant executed both the consent to search and the waiver of rights sections of GX 4. (Tr. 52). Then he accompanied several police officers to his apartment where he removed some cocaine from a shirt pocket in a closet and turned it over to them. (Tr. 56–57).

In *Miranda*, 384 U.S. at page 474, 86 S.Ct. at page 1628, the Court said:

"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to the police, they must respect his decision to remain silent."

█ In applying this aspect of *Miranda* to the instant case, the Court finds that defendant asked to see or call his attorney eight to ten times between 9:30 and 11:00 p. m. There is no explicit contradiction of this testimony in the record. Defendant's requests were not granted despite these repeated demands and ultimately he was asked to make a statement without benefit of counsel. The government contends that defendant never made such requests. It relies on the inference to be drawn from the fact that defendant did not ask for his lawyer when Sergeant Houlihan advised him of his rights prior to questioning him. The defendant Martin, however, testified that he was told he could confer with counsel only after he had confessed, after he had "already told," but prior to his attestation of the longhand transcription. Sergeant Houlihan's testimony is wholly uncorroborated. The record does not contain a waiver of rights form executed before the confession was given. Moreover, Detective Jackson, the other police interrogator, was not called to substantiate Houlihan's statements.[4] The Court finds there is credible evidence that defendant sought to exercise his constitutional right to confer with his

4. The government did not call Detective Jackson at the hearing, nor did it offer an explanation for his absence. However, in its Memorandum of Law at page 5, the Court is informed that Detective Jackson was unable to testify because of a death in his family on the night preceding the hearing. The government then "renews its offer" to call him.

The Court does not guide litigants in their trial or hearing strategy. The government could have requested a postponement of this short hearing if it believed its case would be substantially prejudiced by the absence of Detective Jackson. Instead, it did not even refer to him as a potential witness during the hearing. The Court assumes that the decision not to request an adjournment resulted from a conscious evaluation by the government that its case could stand alone without Jackson's testimony. The fact that this was not an accurate estimate does not entitle the government to reopen the hearing at this point. Moreover, the sound rationale behind the "exclusion of witnesses" rule works to further dampen the Court's enthusiasm for the government's request. Permitting Jackson to testify now would be equivalent to having allowed him to remain in the courtroom during the entire hearing, and then asking for his testimony. The Court has declined to follow such a procedure previously during these proceedings (see note 3), and declines to do so now.

attorney prior to giving his oral confession.

The Court's inquiry does not terminate at this point, however. The *Miranda* Court said, at page 475, 86 S.Ct. at page 1628:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14 [84 S.Ct. 1758, 1764, 12 L.Ed.2d 977]. *This Court has always set high standards of proof for the waiver of constitutional rights,* Johnson v. Zerbst, 304 U.S. 458 [,58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. *But a valid waiver will not* be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."

There is no evidence in the record suggesting a waiver. The defendant asserted his right to counsel eight to ten times within the hour and a quarter preceding his oral confession which was given without the presence of counsel. Such an abrupt change of attitude immediately casts doubt over the notion of a voluntary waiver. But more importantly, there is insufficient credible evidence

here to determine that defendant was fully advised of his rights prior to the oral confession. See above. It is impossible to say that defendant "voluntarily and intentionally" relinquished a known right, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), since he had not been informed he possessed such a right. *Cf.* United States v. Collins, 462 F.2d 792 (2d Cir. 1972), where the defendant was fully warned of his rights and the Court found waiver based on a time gap between the officer's brief non-coercive suggestion that he confess, given in a context of honoring a refusal to answer, and the actual confession.

Furthermore, there is evidence that the police may have utilized verbal coercion or cajolery on Martin. He claims to have been told that a lawyer would only take his money but could not prevent deportation. He also asserts the officers indicated a confession would enable him to leave jail more quickly. Sergeant Houlihan denied defendant was thus coerced and cajoled. Again the Court finds Martin's testimony credible and notes the conspicuous absence of testimony from Detective Jackson, who could have corroborated Houlihan's testimony.

The insufficient warnings at 10:45 p. m. were followed by the oral confession. In light of all of the circumstances of this case, the fact of the confession is simply not enough to meet the "heavy burden" of establishing waiver. Therefore, the oral statement must be suppressed.

■ The remaining questions are whether the written statement and the cocaine turned over must be suppressed as "fruits of the poisonous tree." The issue presented is, whether the fact that defendant was more fully apprised of his rights prior to signing the statement or consenting to the search renders admissible GX 5, GX 4 or the cocaine seized. The Court is of the opinion that the obtaining of defendant's signature on GX 5

**332**

and GX 4 was intimately intertwined with the primary illegal conduct here, i. e., the failure to observe defendant's right to confer with counsel. Defendant's signing of these documents, as well as his oral offer to turn over the cocaine, can be considered part of the oral confession transaction; the time gap between the oral confession and the signing of GX 5 and GX 4, and the climate of disrespect for defendant's right to counsel rendered any additional warnings from Sergeant Houlihan and Detective Nauwens mere hollow gestures. Moreover, when defendant received these warnings he had "aready told", that is, "the cat had been let out of the bag." See United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); Killough v. United States, 114 U.S.App. D.C. 305, 315 F.2d 241, 250 (1962) (Wright, J. concurring). Defendant could understandably have felt that once the oral confession had been made, no further damage to his position could result from signing GX 5 and GX 4 and leading the police to the cocaine.

Upon a fair reading of the record the Court cannot say that the signing of these documents and the seizure of the cocaine was anything other than a direct outgrowth of the unconstitutional conduct of the police officers. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Killough v. United States supra; 3 J. Wigmore, Evidence § 859 (Chadbourn rev. 1970). Since the government has failed to establish any independent source for GX 5 or GX 4 or the seized cocaine,[5] this evidence must be suppressed. Wong Sun v. United States, supra.

Defendant Martin's motion to suppress his oral and written statements of June 21, 1971 and the cocaine found in his apartment early on June 22, 1971 is granted.

So ordered.

5. In fact, the government admits that the officers had no knowledge of the cocaine in defendant's apartment prior to his ad-

mission to that effect. See government's Memorandum of Law at page 7.