OPINION OF THE COURT
Vincent F. Naro, J.
The defendant, Wayne Golden, has been indicted for robbery in the first degree, robbery in the second degree and criminal possession of a weapon in the fourth degree. The defendant made certain statements at the time of and following his arrest. He moves to suppress those statements as involuntary within the meaning of CPL 60.45. After conducting a Huntley hearing, the court makes the following findings of fact and conclusions of law.
On May 17, 1982, at approximately 11:25 a.m., Police Officer Brendan Daily and his partner, responding to a radio run, proceeded to Jamaica Avenue and Sutphin Boulevard where they observed and spoke to Errol Hart.
They were informed by Errol Hart of a past robbery and advised that one of the perpetrators had entered a nearby bus. The officer entered the bus and asked the suspect to leave the bus. Once outside, the defendant was informed he was a suspect in a robbery. At that time, the complainant identified Wayne Golden as one of his assailants and he *1050 was placed under arrest for robbery. The suspect denied any involvement, asserting he had never previously seen the complainant.
During the trip to the 103rd Precinct, the defendant was read Miranda warnings by Officer Lally. The defendant did not answer any of the questions asked of him; however, the officer stated the defendant did nod in the affirmative to the first two questions asked of him: You have a right to remain silent and anything you say may be used against you.
Upon arriving at the 103rd Precinct about 11:45 a.m., the defendant was brought to the detectives’ squad room and placed in a holding cell. The officer conducted his investigation in the same room by conferring with detectives from the 113th and 103rd P.D.U. He also telephoned Detective Durnin assigned to Career Criminal Investigations Unit (C.C.I.U.) at the 112th Precinct. Detective Durnin advised Officer Lally he would come to the 103rd Precinct and assist in the investigation. Thereafter, and within 15 or 20 minutes of the defendant’s arrival at the police precinct, Officer Lally approached the defendant in order to take his pedigree. The officer asked the defendant if he had never previously seen the complainant, why would he make up such a story. The defendant answered, “I didn’t do it, but I was there. If you let me go, I’ll tell you who did it.”
Approximately one hour later, Detective Durnin arrived at the precinct and Officer Lally informed the detective he had administered Miranda warnings to the defendant and he was willing to co-operate.
Detective Thomas Durnin called as a witness, testified he was assigned to C.C.I.U. On May 17, 1982 at approximately 12 noon, he received a telephone call from Police Officer Lally of the 103rd Precinct informing him that Officer Lally had made a felony arrest. After checking certain records at his office, he agreed to assist in the investigation and proceeded to the 103rd Precinct arriving at 1:00 p.m. where he met Officer Lally and the complainant. The witness inquired whether the defendant had requested an attorney and was informed he had not.
*1051 At about 2:00 p.m. after conferring with the arresting officer, he met and spoke to the defendant. Miranda warnings were administered from a card in his possession, deemed received into evidence as People’s Exhibit No. 1. After reading each question from the exhibit, the detective noted the defendant responded “yes” to the questions, and the defendant also signed the card after indicating his willingness to answer questions.
The detective then questioned the defendant and prepared a two-page statement as the defendant related his account of the incident. Subsequently, the defendant signed the statement, People’s Exhibit No. 2, deemed received in evidence.
Detective McCabe, Detective Durnin’s partner, then asked the defendant whether he would provide the police with the names and locations of the persons involved in the robbery. Detective Durnin testified that in his presence the defendant provided Detective McCabe with the names of the perpetrators and information as to where they resided. This information was recorded by Detective McCabe on a separate paper.
The witness stated he could not recall the defendant saying to him, if he were released, he would disclose the identity of the persons who committed the robbery. Detective Durnin also denied the defendant requested counsel.
Our analysis is addressed to the following issues:
(1) Does the defendant’s silence following Miranda warnings constitute a valid exercise of his constitutional right against self incrimination.
(2) Does the defendant’s silence in response to Miranda warnings create a per se prohibition of any further interrogation.
The significant passage in Miranda v Arizona (384 US 436, 473-474), which the defendant relies on concerning the first issue, reads: “Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement *1052 taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.”
The passage states that “interrogation must cease” when a person in custody indicates “he wishes to remain silent”.
A review of Officer Lally’s testimony discloses that after administering Miranda warnings to the defendant immediately after his arrest, the defendant made no response.
It is conceded the only reaction by the defendant to the warnings was to nod his head affirmatively to the first two questions put to him by the arresting officer. The record also reveals the defendant was not questioned at that time.
Subsequently, at the police precinct some 15 or 20 minutes after the defendant’s arrival, he was approached by the arresting officer and without preamble asked, “Well, if you never saw him before, why would this guy make it up?” The defendant answered, “I didn’t do it, I was there. If you let me go, I’ll tell you who did it.”
In the Miranda case, the Supreme Court addressing the subject matter of a suspect’s silence, held (384 US, at p 475): “An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.” (Emphasis added.)
As early as 1962, the Supreme Court in support for this rationale in Carnley v Cochran (369 US 506, 516) stated: “Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.”
Some courts have interpreted the Miranda decision to require an express waiver while other courts have not.
*1053 In North Carolina v Butler (441 US 369, 373), the Supreme Court concluded an express statement of waiver is not required: “An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant’s silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights.”
The defendant did not testify nor did he offer any witnesses on his behalf at the Huntley hearing. The burden of proof rests with the People to establish beyond a reasonable doubt, that the defendant knowingly, intelligently and voluntarily waived his right to counsel. It is also incumbent upon the People to establish by the same standard that the defendant’s statement was given voluntarily.
In Johnson v Zerbst (304 US 458, 464), the Supreme Court defined waiver as: “an intentional relinquishment or abandonment of a known right or privilege * * * [which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.”
We are asked by the People to infer from the defendant’s response that he understood his constitutional rights and voluntarily waived the rights delineated by the Miranda decision. Although argument does not seriously question whether the defendant understood his rights in the final analysis, this court cannot ignore the uncontroverted fact that the only gesture elicited by the defendant at this juncture was an indecisive nod of the head to certain questions put to him by the arresting officer.
At no time did the defendant indicate a willingness to waive his right to remain silent. Following his arrest he was transported to the 103rd Precinct where he was placed in a holding cell. Officer Lally then conducted his investí *1054 gation by telephone for the most part, in the same room albeit some distance from the defendant.
During the trip to the police precinct and as the police officer conducted his investigation, the defendant never offered or volunteered any explanation of his actions to the officer.
It was not until he was asked a question by the arresting officer concerning the crime 15 or 20 minutes after his arrival at the precinct, that he made an inculpatory statement. This response, made in conversation not initiated by the defendant at a time when he had indicated his unwillingness to speak, cannot be construed a valid waiver.
In this court’s view, from the totality of the circumstances, the defendant’s statement to Officer Lally must be suppressed. Although an express statement of waiver is not required to a finding that an accused has waived his constitutional rights, a valid waiver will not be presumed simply from the defendant’s silence after Miranda warnings have been given: (People v Schroder, 71 AD2d 907.)
Having found Golden’s oral statement to Officer Lally to have been induced by improper custodial interrogation, we next address the question of whether the subsequent administering of the Miranda warnings could have sufficiently served to protect the defendant’s rights and rendered his written statements admissible. Defense counsel argues the statement given by the defendant to Detective Durnin followed on the heels of the admission to Officer Lally and must be suppressed on the theory of the “cat out of a bag.” (See United States v Bayer, 331 US 532.) In our view, the Bayer decision is not controlling. In order to find the second statement of the defendant premised on constraint of his first statement, the court must find that the defendant believes himself so committed by a prior statement that he feels bound to make the second statement. This is a factual question which depends on the defendant’s state of mind. The defendant Golden did not testify at the Huntley hearing and consequently, there can be no basis in fact, for the court to conclude that the defendant’s second statement was compelled by his first statement. (People v Tanner, 30 NY2d 102.)
*1055 Unlike the defendant’s argument which requires an examination of the defendant’s testimony as to his state of mind, the defendant proffers an additional ground for the suppression of the statement based on the holding in Westover v United States (384 US 436), decided as a companion to the Miranda decision. The Supreme Court concluded in Westover that the defendant had been subjected to such a continuous interrogation as to render Miranda warnings, administered in the midst of such questioning, insufficient.
Finding support for this theory, the Court of Appeals in People v Chappie (38 NY2d 112, 115), held: “Warnings, to be effective under the combined holdings in Miranda and Westover, must precede the subjection of a defendant to questioning. Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning.”
Here, the first statement was made by the defendant at about 12 noon. There is no testimony as to what happened during the time that elapsed until Detective Durnin arrived at the 103rd Precinct at about 1:00 p.m. Detective Durnin then familiarized himself by questioning Officer Lally and the complainant and there followed another hiatus of about an hour. At approximately 2:00 p.m., Detective Durnin met and interrogated the defendant following Miranda warnings. The record is silent as to where in the 103rd Precinct the defendant was questioned or whether Officer Lally was present.
In the case at bar, the two interrogations were conducted during the same day, at the same location, by different interrogators and were separated by a two-hour span. Officer Daily’s interrogation of the defendant was brief and consisted of one question other than pedigree. Under the circumstances of this case, it can hardly be said the defendant had been subjected to continuous custodial interrogation within the context of Westover and Chappie.
This case may be further distinguished from the line of cases cited by defense counsel in yet another significant regard. In the cases cited by defense counsel, there exists *1056 some infirmity either in administering the initial Miranda warnings to the suspect or in disregarding his request not to be questioned in the absence of counsel. Here, the defendant Golden made no affirmative response or gesture following full and complete Miranda warnings given to him by Officer Lally.
Certainly, after an individual in custody has indicated a desire to remain silent, that right must be scrupulously and fully honored. (Michigan v Mosley, 423 US 96.)
What Miranda does not address itself to is under what circumstances, if any, is a resumption of questioning permissible.
Miranda can be literally read to say that when a person in custody indicates his desire to remain silent he can never again be subjected to custodial interrogation. The difficulty with this construction is that if this were in fact the purpose and intent of the Supreme Court in Miranda, it could have created a per se rule against further interrogation in clear and succinct language.
It is apparent the Supreme Court was concerned in Miranda with the prospect that the will of a person being questioned could be “undermined” if questioning was resumed after some unspecified period following an assertion of the “right to silence”.
To allow the continuation of custodial questioning after a brief cessation would clearly thwart the purposes of the Miranda decision and conceivably such questioning could undermine the will of an individual subjected to questioning.
However, certainly a waiver secured by undermining a suspect’s will can be dealt with by excluding any statements which are the result of an involuntary waiver.
Although Miranda may be read to require that all interrogation must cease following an assertion of the “right to silence”, it would appear this interpretation would be inconsistent with the voluntariness standard by which to judge an informed waiver. There is no allegation here that Officer Lally persisted in repeated interrogation of the defendant which lowered his resistance and caused him to change his mind.
*1057 In the case at bar, the testimony disclosed that the defendant was questioned by Detective Durnin following his arrival at the 103rd Precinct. The record reveals Detective Durnin met and questioned the defendant at approximately 2:00 p.m. No challenge is addressed to whether the so-called warnings required by the Miranda decision were administered to the defendant by Detective Durnin. The issue in this case, rather, is whether the defendant’s initial silence in response to Miranda warnings precluded law enforcement authorities from further questioning.
It would be absurd to suggest under the circumstances of this case that the defendant can never again be subjected to custodial interrogation after his initial silence. This is not to say that after a momentary cessation the police should be permitted to renew custodial interrogation. This would, if allowed, frustrate the purpose of the Miranda decision and permit the very abuses Miranda sought to avoid.
Here, after an interval of almost two hours, the defendant was questioned by Detective Durnin. He was given accurate and complete Miranda warnings at the outset of this interrogation from a card deemed marked into evidence as People’s Exhibit No. 1, which was signed by the defendant. He was informed again that he could remain silent and could consult with an attorney if he so desired. Every opportunity was accorded to the defendant to exercise these options.
Although it is not clear from the record how much Detective Durnin knew about the earlier interrogation by Officer Daily, there was no indication the defendant expressed any reluctance in answering questions put to him by Detective Durnin. Nor can it be said from the testimony that the will of the defendant was undermined by the detectives’ questioning. None of the practices usually condemned by our courts associated with custodial interrogation, were presented here.
The court is satisfied the defendant’s statement to Detective Durnin was intelligently and voluntarily made following an informed waiver.
*1058 To suggest under the circumstances of this case, that the police should be precluded from further questioning, is not supported by the law or common sense.
Finally, we are also asked to suppress the defendant’s initial statement following his arrest at the scene. The defendant was identified by the complainant after exiting the bus and placed under arrest by Officer Tally. At that time, the defendant stated: “He never saw the man before.”
This statement preceded the administering of Miranda warnings and was not in response to any questions asked of him by the arresting officer.
The statement was spontaneous and voluntarily made by the defendant and should not be suppressed.
This court has considered defense counsel’s remaining contention and finds it to be without merit.
The defendant’s statement to Police Officer Tally offering to co-operate was neither prompted nor acted upon by the police so as to create in the defendant an expectation that he would be set free. Support for this argument may be found in the testimony of both Police Officer Tally and Detective Durnin.
In response to the defendant’s remark, Police Officer Tally testified his only comment was to the effect that he (the defendant) could speak to the detectives when they arrived.
Detective Durnin testified he had no recollection the defendant offered to co-operate if he were released and further that he incorporated the defendant’s entire statement in People’s Exhibit No. 2.
Accordingly, there is no evidence the defendant’s statement was extracted by threats or promises, expressed or implied, however slight, nor by the exertion of any improper influence.