DIVERSIFIED PACKING
AND DEVELOPMENT
CORPORATION,

v.

DORE & ASSOCIATES CONTRACT-
ING, INC.; Integra Metals Technolo-
gy, Inc.; Andrew A. Denuzzio; Alex
Simkovich; Harry Laughery; Oregon
Steel Mills, Inc.

Dore & Associates Contracting,
Inc. Appellant.

No. 01–2740.

United States Court of Appeals,
Third Circuit.

Argued May 3, 2002.

Decided Sept. 17, 2002.

Victor P. Stabile (Argued), Dilworth Paxson, Harrisburg, PA, for Appellant Dore & Associates Contracting, Inc.

John P. Borowski, DeZao & DiBrigida, Parsippany, NJ, for Appellee Diversified Packing & Development Corporation.

Mark D. Feczko (Argued), Kirkpatrick & Lockhart, Pittsburgh, PA, Robert B.

Sommer, Hergenroeder, Rega & Sommer, Pittsburgh, PA, for Appellee Oregon Steel Mills, Inc.

Before ROTH and STAPLETON, Circuit Judges, and POLLAK,* District Judge.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

### I.

This action arises out of a complex set of commercial relationships among appellant Dore & Associates Contracting, Inc. ("Dore"), appellee Oregon Steel Mills, Inc. ("Oregon Steel"), non-party Integra Metals Technology, Inc. ("Integra"), and appellee Diversified Packing & Development Corporation ("Diversified").

In early 1996, Andrew Denuzzio and Alex Simkovich incorporated Integra with the goal of locating a steel mill in Washington, Pennsylvania. At the same time, Oregon Steel wanted to sell certain equipment from its mill site in Fontana, California, because it lease was about to expire and it planned to shut down the mill. In order to accommodate these complementary needs, on April 3, 1996, Integra and Oregon Steel entered into a Capital Contribution Agreement ("CCA"). Under the CCA, Integra was to receive the Fontana mill assets, and Oregon Steel was to receive 13% of Integra's stock and a cash payment of $1,000,000. The transfer of title was to take place upon the equipment's delivery to Integra in Pennsylvania. In order to secure certain rights of Oregon Steel as a shareholder of Integra, Integra and Oregon Steel also entered into a Shareholder Agreement on the same day they entered into the CCA.

Integra was responsible for dismantling and transporting Oregon Steel's mill assets to Pennsylvania at its own expense. The CCA expressly states that Integra will contract with a third party to transport the assets. The relevant paragraph states in part:

3.4 *Fontana Dismantling Contract.* [Integra], as a licensee from [Oregon Steel], shall contract (the "Fontana Dismantling Contract") with a third party (the "Fontana Dismantler") to, on behalf of [Oregon Steel], dismantle, package, load onto a common carrier and deliver to [Integra] in Pennsylvania (or to an alternate location as designated by [Integra]) the Fontana Mill Assets.... [Oregon Steel] agrees to deliver possession of the Fontana Mill Assets to Dismantler in California for Delivery to [Integra] in Pennsylvania.

App. at 75 (¶ 3.4).

After signing the CCA and Share Purchase Agreement, Integra solicited bids for the dismantling work. Dore and Diversified each submitted proposals to Integra. Integra selected Dore. Pursuant to the Dismantling Contract, dated May 3, 1996, Integra agreed to pay Dore $1,037,500 plus a percentage of the proceeds from the sale of the scrap to serve as the general contractor for the job. The first page of the Dismantling Contract states, "Whereas Integra is the licensee and agent of Oregon Steel Mills, Inc. pursuant to that certain Capital Contribution Agreement dated April 4, 1996 between Integra and Oregon Steel Mills, Inc...." App. at 120.

Dore kept the demolition and scrapping work for itself and subcontracted with Diversified for the dismantling portion, which

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsyl-

vania, sitting by designation.

requires the precise disassembly of component parts for future reuse. On May 5, 1996, Dore and Diversified signed an agreement by which Dore agreed to pay Diversified $715,000 for its part of the job—10% in the form of a mobilization fee.

Diversified in turn subcontracted with Sydel Corp., t/a Jopac, Inc. ("Jopac"), to provide certain necessary labor in the form of millwrights and riggers to disconnect and dismantle the designated steel mill equipment and to remove it with cranes or other special equipment. Diversified agreed to pay Jopac $580,000 for this labor, 10% of which was paid up front as a mobilization fee.

Integra contracted directly with Diversified for transportation of the dismantled equipment. Integra agreed to pay $730,000 for Diversified's services. This agreement was signed on June 21, 1996.

On May 3, 1996, the day the Integra–Dore Dismantling Contract was executed, a pre-construction conference was held at the Fontana site. Representatives of Integra, Dore, and Oregon Steel were all present. Dore claims that it was unaware, until arriving at the Fontana site, that Integra had to obtain additional financing for the project. Therefore, in a series of letters between Dore and Integra, which were not copied to Oregon Steel, Dore repeatedly sought assurances of payment from Integra. This issue was settled in a May 29, 1996, letter agreement which permitted the imposition of liens upon Oregon Steel's equipment to secure payment for Dore's work. Dore did not communicate with Oregon Steel about this letter agreement.

Work began at the Fontana site on May 13, 1996. Dore and Diversified shut down work at the site on two occasions. First, on May 28, 1996, Dore and Diversified shut down work as a result of concerns about financial assurances. This shutdown was resolved by the May 29, 1996, letter agreement discussed above. The second and final shutdown occurred on July 3, 1996, as a result of nonpayment by Integra, which was unable to obtain construction financing.

Diversified filed a complaint in the Western District of Pennsylvania against Dore, Oregon Steel, Integra and Denuzzio and Simkovich seeking damages in the amount of $121,500 for breach of the Dismantling Subcontract. Diversified also filed suit in the Western District of Pennsylvania against Oregon Steel and Integra seeking damages of $146,000 for breach of the Transportation Contract. These two cases were consolidated. The individual defendants, Denuzzio and Simkovich, were dismissed prior to trial; Integra was dropped as a defendant at trial. Dore subsequently asserted a cross-claim against Oregon Steel for breach of the agreement to pay for the dismantling of the equipment.

The District Court held a jury trial beginning on April 2, 2001, on all claims. The Court finished its charge and reviewed the verdict slip with the jury at around 9:30 on the morning of Tuesday, April 10. Thereafter, the jury submitted three questions for the Court: a) "If we deem Integra as being the agent of Oregon Steel, does Oregon automatically have to pay on the contract?" b) "They can be an agent, but under what terms?" and c) "What is the definition of licensee?" App. at 1036. The court informed the jury, "you must decide these issues based on the instructions of the Court. I've already covered all aspects of these questions in the instructions of the Court." App. at 1038.

The jury asked another question even later that day: "can we have the Judge recharge the jury? Some of the definitions and terms need [to be] reexplained to

us." App. at 1038–39. The court decided not to recharge the jury explaining "the jury has failed to itemize any specific concepts, and until it does that, I'm not going to recharge the jury ab initio." *Id.*

At 2:00 P.M., the jury returned with two further questions: a) "Do we have to award the amounts based on breach of contract laws of profit, cost, or can we pick any figure we choose for settlement?" and b) "When was the lawsuit filed? We need this to determine the amount of interest owed, if any." App. at 1040. The court directed the jury to decide the case on the facts in the record and the law as explained by the judge.

The next day, on April 11, 2001, the jury presented the court with its last request: "We are at a standstill in deliberations. The only way to clarify and resolve any further is to have the law explained again by the Judge. Can we please have the law re-explained?" App. at 1044. In response to this, the court indicated to the jury that it was going to re-explain the law of agency and the contentions of the parties.

The court reinstructed the jury on three principles of agency: actual authority, apparent authority, and agency by estoppel. Counsel for Dore requested that the court also recharge on the rule of liability set forth in 258 of the Restatement of Agency (Second). Dore's request was denied.

Later that day, the jury, finding no agency relationship, returned a verdict in favor of Oregon on both Diversified's claim and Dore's cross-claim. However, the jury returned a verdict in favor of Diversified and against Dore for breach of the Dismantling Subcontract. The jury awarded Diversified the full amount of its requested damages on that claim, $121,500.

Both Dore and Diversified filed post trial motions seeking judgment as a matter of law or new trials with respect to the verdicts in favor of Oregon Steel. Dore also filed a motion challenging Diversified's award of $121,500, alleging that the jury ignored the court's instruction that it had to deduct from any award the costs saved by Diversified by not having to complete work under its subcontract. The District Court denied all post-trial motions.

Dore is the only party to appeal from the judgments entered by the District Court. Dore contends that the District Court erred by refusing to recharge the jury on the theory of liability in Restatement (Second) of Agency § 258; by refusing to provide separate jury interrogatories on the verdict slip to determine whether Dore and Diversified each met their separate burdens of proving agency on Dore's dismantling and Diversified's transportation contracts; and by denying Dore's post trial motion for a new trial on Diversified's claim of damages due to a lack of evidence.

## II.

### A. Supplemental Jury Charge

■ The form and extent of supplemental jury instructions are matters for the sound discretion of the Court. *See Riley v. K Mart Corp.*, 864 F.2d 1049, 1054 n. 6 (3d Cir.1988). As the Supreme Court has stated:

> Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge in the light of the whole trial and with the jury before him may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse.

*United States v. Bayer*, 331 U.S. 532, 536–37, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). Here, the appellant does not argue that

the initial jury charge was incorrect, merely that the District Court deemphasized an important legal argument by failing to give a supplemental charge on § 258. We must consider all the court's instructions as a whole, including the supplemental instructions, to determine whether they are misleading or inadequate to explain the law. *See Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 191 (3d Cir.1990); *see also Time, Inc. v. Petersen Publ'g. Co.*, 173 F.3d 113, 119 (2d Cir.1999).

Actual authority, apparent authority, and agency by estoppel are methods of establishing the authority of the purported agent, to bind the purported principal. Section 258 provides a rule of liability governing a principal's tort liability for certain misstatements of one who has been shown to be his agent. Section 258 of the Restatement states:

> In the absence of an exculpatory agreement, a principal authorizing a servant or other agent to enter into negotiations to which representations concerning the subject matter thereof are usually incident is subject to liability for loss caused to the other party to the transaction by tortious misrepresentations of the agent upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unauthorized.

Restatement (Second) of Agency § 258 (1958). Under this section, the precondition for application of liability is an agent/principal relationship. That is, prior to applying this section, the factfinder must determine that an agency relationship exists.

The role of § 258 and the role of the principles governing the creation of agency authority are sufficiently different in this litigation that the District Court's decision to reexplain the latter and not the former was well within its discretion. Moreover, that decision could not have affected the ultimate result. The jury here found that neither Dore nor Diversified carried their burden of proving that Integra had agency authority and, therefore, the jury had no occasion to reach the theory of liability embodied in § 258.

### B. Special Interrogatory

 The District Court submitted the following interrogatory to the jury in its verdict slip:

> 1. Did plaintiffs, Diversified Packing and Dore & Associates, prove, by a preponderance of the evidence, that Integra Metals was the agent of Oregon Steel Mills with the authority to execute contracts that required Oregon Steel to pay the dismantling and transportation costs at the steel plate mill in Fontana, California?

> _____

> _____

> Yes No

App. at 33. According to Dore, the court's interrogatory is infirm because it fails to distinguish between Dore and its situation with the dismantling contract and Diversified and its situation with the transportation contract.[1] It insists that the jury should have be afforded the opportunity to determine that Dore had carried its burden with respect to the dismantling con-

---

1. Contrary to Oregon Steel's contention, we conclude that Dore preserved this objection in the District Court. After concluding its instructions to the jury, the court asked if there were any exceptions. Oregon Steel objected to the form of interrogatory 1 arguing that it "should be split". App. at 1022. Dore joined the objection stating, "I did join with Mr. Sommer on the first instruction to ask that it be put in separately for dismantling and transportation." App. at 1023.

tract even if it believed Diversified had not carried its burden with respect to the transportation contract. We review the construction of special verdict interrogatories to the jury for abuse of discretion. *See Merritt Logan, Inc. v. Fleming Co. Inc.*, 901 F.2d 349, 367 (3d Cir.1990) ("The question of how special interrogatories are to be framed is committed to the discretion of the trial judge.").

We conclude that any error was harmless on this record. The evidence offered by Dore and Diversified relevant to the agency issues was not materially different, the arguments they made in their closings were not materially different, and the court, without objection from the parties, explained their contentions to the jury as being identical. We are confident that the jury would not have made a distinction between the two even if that opportunity had been afforded them.

With respect to the agency issue, the court instructed the jury on "actual authority," "apparent authority" and "agency by estoppel." App. at 1010–11. Understandably given the provisions of the CCA, both Dore and Diversified placed primary reliance on "actual authority." Actual authority requires a manifestation by the principal to the agent that the agent is to act on his account. Restatement (Second) of Agency § 26. The evidence relied upon by both Dore and Diversified to so prove was the same—i.e., the CCA.

Apparent authority can, of course, be conferred on an agent only by actions of the principal and not by actions of the agent. Restatement (Second) of Agency § 27. Dore's and Diversified's evidence with respect to this issue was substantially the same. Responsible officials of both testified that they had been assured by Royce Edgington, Oregon Steel's site representative, that Oregon Steel and Integra were in "a joint venture." While Integra made additional representations with respect to its relationship with Oregon Steel, the only relevant evidence about Oregon Steel's conduct was Edgington's representation that there was a joint venture. While no one asked the court to explain to the jury the relationship between a joint venture and an agency, assuming that the Edgington evidence is relevant, it was materially the same with respect to both Dore and Diversified.

Agency by estoppel, too, can arise only from the conduct of the purported principal. Restatement (Second) of Agency § 8B. If the purported principal becomes aware that others are dealing with the purported agent in the mistaken belief that he is the agent of the purported principal and does not take reasonable steps to correct the mistake, the purported principal is responsible for damages suffered when the third party thereafter relies and changes position to his detriment.[2]

■ Dore asserts that it had a stronger case of agency by estoppel than Diversified

2. As the Restatement puts it:

A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him if

. . . . .

knowing of such belief and that others might change their positions because of it,

he did not take reasonable steps to notify them of the facts.

Restatement (Second) of Agency § B(1)(b).

had because, in connection with a preconstruction meeting on the site on May 2, 1996, Oregon Steel's Project Manager, Mr. Bird, received a copy of Dore's dismantling subcontract with Integra which contained a "Whereas" clause referring to Integra as the "licensee and agent of Oregon Steel ... as more fully described in the Capital Contribution Agreement." According to Dore, the delivery of this document to Oregon Steel's Project Manager alone put Oregon Steel on notice that Dore was relying on Oregon Steel to make the payments called for in the Integra contract.

As Oregon Steel's counsel stressed to the jury in closing, however, Mr. Bird was present at this meeting for purposes wholly unrelated to an analysis of the legal implications of the recitals of the contract between Integra and Dore, an analysis that he was not qualified to conduct, and it would hardly be reasonable to expect him to have drawn the inferences that Dore now claims he should have drawn. In short, we conclude that delivery of this contract document to Mr. Bird would not support a finding of agency by estoppel. Since this is the only evidence to which we have been referred in support of this theory, it follows that Dore's agency by estoppel argument does not make it reversible error for the District Court to fail to distinguish between Dore and Diversified in Interrogatory 1.

### C. Sufficiency of the Damages Evidence

Lastly, Dore contends that it is entitled to a new trial on damages against Diversi-

fied because the amount of the jury's damage award was not supported by the evidence. Dore raised this same claim in post trial motions. The District Court held that there was sufficient evidence to sustain the jury's verdict. In reviewing a District Court' decision to grant or deny a motion for a new trial, we look to see whether the court abused its discretion. *See Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3d Cir.1993).

■ The District Court correctly charged the jury as follows with respect to the measure of damages for a breach of contract:

> The preferred method under the law of contract damages is to protect the injured party's expectation. This means that damages should be designed to place the party in the same position it would have been if the contract had been performed. To this end, expectation damages are measured by the losses caused and the gains prevented by a defendant's breach of contract, to the extent that they are in excess of any savings made by possible nonperformance.[3]

App. 926–27. *See ATACS v. Trans World Communications*, 155 F.3d 659, 669 (3d Cir.1998) (explaining the measure of expectation damages).

In the context of a construction contract where the builder is precluded from completing his performance by a material breach of the owner, this means that the builder is entitled to receive the "contract price (or so much as remains unpaid) less

---

**3.** The Court thus paraphrased Restatement (Second) of Contracts § 347 (1981) which provides:

> Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by

> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
> (c) any cost or other loss that he has avoided by not having to perform.

the amount it would cost the builder to complete the job." Charles T. McCormick, *Handbook on the Law of Damages* § 164 (1935).

The following portions of Diversified's brief describe the scope of Diversified's subcontract with Jopac and the state of the dismantling project when Dore ordered a work stoppage on July 3, 1996:

On May 5, 1996 Richard Masco, president of Diversified, signed a subcontract with Dore for a contract price of $715,000. . . . Diversified was a particular subcontractor with extensive dismantling experience, international in scope, and they were a perfect fit to work on a fast track basis which was required because of the tight deadlines. . . .

Pursuant to the subcontract Diversified agreed to dismantle, remove and load designated equipment at the Fontana plant. Specifically, it agreed "to furnish all labor, materials, tools, equipment, transportation." . . . The subcontract specifically stated that Diversified shall "perform any and all necessary work to complete all rigging, dismantling, removing and loading as [Dore] is required to perform under The Principal Contract." . . .

Diversified thereafter contracted with Jopac to provide the necessary labor in the form of millwrights and riggers to disconnect and dismantle the designated steel mill equipment and remove it through cranes or other special equipment to designated lay down areas on site. . . . Dore and Diversified agreed that Masco would be on site at all times while the work was being performed to act as project manager. . . .

. . . The plant which housed the equipment was about 300 yards long. . . . The objective was to dismantle 3,300 tons of processing equipment that included, but was not limited to, one fur-

nace, one four high mill, a two-high mill, one 10,000 horsepower GE motor, two 7,500 horsepower GE motors and small equipment that connects everything together. . . .

At trial the jury was made aware of the enormity of the dismantling project by the characterization of certain aspects of the job by witnesses from Diversified as well as Dore. The jury was apprized of the fact that the subject pieces were large and difficult to remove. . . .

.　　.　　.　　.　　.

. . . Diversified had supervised the breakdown and removal from their respective locations of 69% of the scheduled units designated for reuse by the time work shut down. . . . While the transportation was pursuant to a separate agreement between Diversified and Integra, nonetheless, loading was part and parcel of the Dore–Diversified subcontract. . . . Richard Masco was involved in the plan to transport the equipment by truck and rail, along with the necessary prep work of fashioning crates, boxes, and skids to package parts and, in some instances, direct supervision of the loading. . . .

Appellee Diversified's Br. at 6–11.

The testimony most helpful in understanding Diversified's role on the site was provided by Richard Masco, its site supervisor:

Q. . . . Could you just give us a brief overview of what the dismantling, or how the dismantling occurred from when you first mobilized up until when you stopped work in July of 1996?

A. Okay. We started to mobilize on the 13th, which means that we brought our supervision in, our foreman to look over the job, go from Point A to Point B on the job explaining what had to be done.

In that time frame we also contracted and contacted any vendors that we may need for specialized equipment that may have been required to go on the job. And then we began to bring in our crew. We brought a basic crew. Jopac brought a basic crew from Philadelphia to the site, and then, we hired additional labor there, primarily people that had worked in the mill prior to the mill closing down, so that we had good, experienced people, preferably maintenance people, and we began to dismantle. And in the dismantling process we, we remove it from Point A to a staging area, what we call the lay-down area, where it's ready to load or be prepared to load.

Q. Was it part of your contract to dismantle, remove, and then load onto the common carriers at the time when it was arranged?

A. Yes. Yes, it was.

App. at 221–22.

If the Diversified/Dore contract had been fully performed, Diversified would have received the contract price of $715,000. In the course of the performance necessary to entitle it to that compensation it would have had to pay Jopac $580,000 for the labor it provided. This leaves a balance of $135,000. The parties further agree that this figure must be reduced by the $13,500 Diversified's portion of the mobilization fee received from Dore which it expended on startup costs.[4] This is the basis for Diversified's damage demand of $121,500, the figure that the jury awarded.

■ Dore points out, however, that Diversified did not have to fully perform the Dore/Diversified contract. Dore ordered a work stoppage on July 13, 1996, when Diversified had completed only 69% of its work. It stresses that the remaining performance would obviously have required Diversified to incur costs that it saved from being relieved of the duty of full performance. Since Diversified would have had to incur those costs in order to be entitled to the $715,000 contract price, Dore argues, a damage award based on the contract price that does not take those saved costs into account puts Diversified in a better position than it would have been in had there been no breach. Dore correctly points out that Diversified provided the jury with no basis for estimating those saved costs.

When one of Diversified's principals, John Colaiacovo, explained its $121,500 damage claim to the jury, he was asked about saved costs. He did not deny that Diversified, by being relieved of the duty of full performance, saved money it would otherwise have had to expend. Rather, he insisted that Diversified didn't need to deduct those saved costs because it was not responsible for the work stoppage:

> Q. . . . My point is, Mr. Colaiacovo, you have not taken out of that One hundred and twenty-one five what you saved by not having to support Mr. Masco and the rest of your overhead out there for the time that you didn't have to stay there to complete the job.
>
> . . . . .
>
> A. Ah, yes, right. You're saying is because we didn't stay until the project was 100 percent complete, okay, but that's you know, I'm, I felt I'm entitled to that because we weren't able to complete the contract.
>
> Q. Right.
>
> A. I'm entitled to the benefit of my bargain.

4. Dore's first payment under the contract was a $71,500 mobilization fee, of which Diversified was obligated to immediately pay Jopac $58,000 under its contract.

Q. Are you, you entitled to get the costs you didn't incur?

A. Yes.

Q. Why?

A. Because I didn't stop the job. I wasn't the one who stopped the job.

Q. All right. Now. Mr. Colaiacovo, then if I understand you correctly, you're asking this jury to award you in your number of $121,500 costs that you didn't incur for the time that you didn't have to stay out there to finish the job; is that right?

A. Yes.

App. at 635–36.

Mr. Colaiacovo held an erroneous view of the law. Not taking saved costs into account puts Diversified in a better position than it would have been absent the breach and, accordingly, the law requires that these saved costs be taken into account in determining expectation damages in a situation of this kind.

Diversified's brief also seeks to sustain its $121,500 award by pointing to the fact that it "maintained an office on site to keep secure equipment, records, and dismantled equipment that had not been transported off site." Appellee Diversified's Br. at 11. While there is evidence to this effect in the record, given the evidence regarding Diversified's responsibilities under the contract, it will not support a finding that there were no saved costs.

The $121,500 verdict is not supported by the evidence. Dore is entitled to a new trial on damages. *See New Orleans & Northeastern R.R. Co. v. Hewett Oil Co.*, 341 F.2d 406 (5th Cir.1965).

### III.

The judgment of the District Court in favor of Oregon Steel and against Dore will be affirmed. Its judgment in favor of Diversified against Dore will be reversed and this matter will be remanded to the District Court for a new trial on damages.