PEOPLE v BELKNAP

Docket No. 75259. Submitted June 11, 1984, at Grand Rapids.—Decided August 23, 1985. Leave to appeal applied for.

Karen J. Belknap was charged with first-degree murder and poisoning food with intent to kill or injure. After an evidentiary hearing the Leelanau Circuit Court, Charles M. Forster, J., held that the defendant had not understood the recital of her rights pursuant to *Miranda v Arizona,* 384 US 436 (1966), and that no meaningful waiver of rights had been obtained. The court therefore held that two statements defendant made to the police were involuntary and therefore inadmissible. The people appealed by leave granted. *Held:*

Review of the entire record, considering all the facts and circumstances shown therein, convinced the Court of Appeals that the trial court erred by finding the defendant's statements to be involuntary and inadmissible. The record does not support the conclusion that the defendant was too unintelligent to understand the *Miranda* warnings or to make a voluntary confession.

Reversed and remanded.

1. CRIMINAL LAW — APPEAL — VOLUNTARY STATEMENTS.

The Court of Appeals, when reviewing a trial court's determination that a defendant's statements were involuntary, and therefore inadmissible, must affirm the trial court's findings unless, after reviewing the entire record, it is left with a definite and firm conviction that a mistake was made.

2. CRIMINAL LAW — WAIVER OF RIGHTS — VOLUNTARY STATEMENTS.

The voluntariness of a defendant's waiver of *Miranda* rights is to

REFERENCES FOR POINTS IN HEADNOTES
[1] Am Jur 2d, Criminal Law §§ 716, 952.
   Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.
[2] Am Jur 2d, Criminal Law § 797.
   Sufficiency of showing that voluntariness of confession or admission was affected by alcohol or other drugs. 25 ALR4th 419.
   Mental subnormality of accused as affecting voluntariness or admissibility of confession. 8 ALR4th 16.

be determined from all the facts and circumstances, taking into account the defendant's mental limitations and determining whether, through susceptibility to surrounding pressures or inability to comprehend the circumstances, a statement was not the product of the defendant's own free will.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Joseph E. Deegan,* Prosecuting Attorney, for the people.

*Larry J. Nelson,* for defendant on appeal.

Before: R. B. BURNS, P.J., and D. E. HOLBROOK, JR. and G. R. DENEWETH,* JJ.

PER CURIAM. Defendant is charged with one count of first-degree murder by poisoning, MCL 750.316; MSA 28.548, and two counts of poisoning food with intent to kill or injure, MCL 750.436; MSA 28.691. After an evidentiary hearing pursuant to *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965), the circuit judge held that two statements defendant made to the police were involuntary and therefore inadmissible at trial. The circuit judge found that no meaningful waiver of rights had been obtained pursuant to *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), because defendant did not understand the recital of those rights. The circuit judge also found that the first statement was obtained in part by coercion.

In this appeal, we are required to examine the whole record and make an independent determination of the ultimate issue of voluntariness. We must affirm the circuit judge's findings that defendant's statements were involuntary unless, after such a review of the record, we are left with a definite and firm conviction that a mistake was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

make. *People v McGillen #1,* 392 Mich 251, 257; 220 NW2d 677 (1974). The voluntariness of a confession must be determined from all the facts and circumstances, including the duration of detention, the manifest attitude of the police toward their prisoner, the physical and mental state of the prisoner, and the diverse pressures which sap or sustain the prisoner's powers of resistance and self-control. *Culombe v Connecticut,* 367 US 568, 602; 81 S Ct 1860; 6 L Ed 2d 1037 (1961). Similarly, the voluntariness of a waiver of rights is also to be determined from all the facts and circumstances. *North Carolina v Butler,* 441 US 369, 374-375; 99 S Ct 1755; 60 L Ed 2d 286 (1979). In determining voluntariness, a court must take into account the prisoner's mental limitations and determine whether, through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of the prisoner's own free will. *Jurek v Estelle,* 623 F2d 929, 937 (CA 5, 1980); *Henry v Dees,* 658 F2d 406 (CA 5, 1981).

The alleged murder victim here was Justin Giltner, and the victims of the other alleged poisonings were Charlotte Giltner, Justin Giltner's wife, and Sheila Keeble. Testimony at the *Walker* hearing shows that Mrs. Giltner and Mrs. Keeble had a history of illnesses involving symptoms similar to those displayed by Mr. Giltner before his death. An autopsy revealed that Mr. Giltner's death was caused by acute arsenic poisoning. Tests on hair and nail samples taken from Mrs. Giltner and Mrs. Keeble showed that they had also been poisoned with arsenic. Defendant was employed as a housekeeper at the Giltners' and the Keebles' summer homes in Leelanau County. Tests on hair and toenail samples taken from defendant showed no concentration of arsenic in defendant's hair but

an extraordinarily high concentration in her toe-nails. This anaomolous result, in conjunction with the fact that she was the sole common link to both households, rendered defendant the prime suspect in the poisonings.

Two statements by defendant were tape-recorded, one on January 27, 1983, and one on January 28, 1983. Defendant admitted poisoning Justin Giltner, Charlotte Giltner, and Sheila Keeble by repeatedly putting ant syrup in their coffee. Defendant sought to place the primary blame for the poisonings on Bill Kimmerly, a son of Charlotte Giltner and a step-son of Justin Giltner. Defendant claimed that Kimmerly repeatedly coerced her to have sex with him and then coerced her participation in the poisoning with threats to tell her husband. According to defendant, she understood that the ant syrup would make the victims sick but did not understand that it would cause death. Defendant suggested that Kimmerly sometimes put the ant syrup in the coffee himself and that he added more ant syrup himself on the occasion that caused Justin Giltner's death. However, some remarks by defendant in the course of the two statements indicate that defendant was motivated to poison Sheila Keeble because she was not given a raise. Defendant displayed considerable confusion about time sequences, but some of her answers seemed to suggest that she had already put ant syrup in Charlotte Giltner's coffee on several occasions before any involvement by Kimmerly. Defendant admitted painting her toe-nails with the ant syrup after learning that the police would seek nail and hair samples from her.

Defendant was questioned by Detective Sgt. Robert Russell of the Leelanau County Sheriff's Department, Detective Carl Goeman of the State Police, and Detective Sgt. Gregory Somers of the

State Police. Russell had known defendant for 10 or 11 years, and Somers was trained as a polygraph examiner and hostage negotiator and was known as a skilled interrogator. On January 27, Russell and Goeman met with defendant at the sheriff's department and advised her of her rights. They did not elaborate on the warnings required by *Miranda,* and defendant indicated that she understood her rights and that she agreed to talk with them. They informed her of the results of the tests on the hair and nail samples and told her that she was their prime suspect. Defendant denied involvement and was asked to take a polygraph. In previous conversations with Russell and Goeman, defendant had agreed to take a polygraph but for various reasons had always postponed actually taking the test. Russell and Goeman told defendant that Somers was present with the polygraph machine. Defendant refused to take the test, but agreed to talk with Russell, Goeman, or Somers. Russell and Goeman left defendant with Somers to be interviewed but stayed outside the room out of sight but within hearing.

Somers did not repeat the *Miranda* warnings to defendant. Somers testified, and Russell and Goeman confirmed, that after Somers again confronted defendant with the results of the test, defendant made a statement consistent with the statement subsequently taped. A subsequent interview between defendant and Russell and Goeman produced the taped statement of January 27. At defendant's request, the officers made arrangements for defendant to speak to her minister, who arrived shortly before the taped interview concluded and who talked to defendant after a brief delay. Defendant was detained in jail overnight, and in the morning she asked a sheriff's deputy who brought her breakfast, Julie Nowinski, if she

could speak to Russell or Goeman. Russell and Goeman met with defendant again, and Goeman again gave defendant the *Miranda* warnings. Defendant again agreed to talk with the officers and the taped statement of January 28 resulted.

Russell, Goeman, and Somers denied shouting or swearing at defendant and denied using any other form of physical or psychological coercion to elicit the statements. Although Russell and Goeman became aware of defendant's history of mental illness in the course of the investigation, the record does not clearly show whether this occurred before the questioning of defendant. The officers acknowledged that their questioning of defendant was in accordance with a preconceived plan. No evidence, other than defendant's statements, implicated Bill Kimmerly in the crimes.

Defendant testified that she did not recall having been read the *Miranda* warnings and that she did not know that she had the right to ask for an attorney. According to defendant, she thought that she was required to answer questions from the police, she could not afford an attorney, and she did not know that one would be appointed for her if she could not afford one. Defendant claimed that, after declining to take a polygraph test, she asked Russell to call her husband. Russell ostensibly called and received no answer. Defendant contradicted this scenario in her statement to Dr. Hinshaw, where she stated the detectives had, after the interview with Somers, asked her if she wanted them to call her husband. Defendant's husband testified that he was at home at the time the detectives allegedly tried to call him. Defendant also claimed that Somers refused to allow her to talk to her minister until she "told the truth".

Defendant testified that Somers yelled and swore at her. According to defendant, Somers told

her that if she told the truth, she could go home that night. After defendant made her statement to Somers, defendant claims that Russell told her that her minister had been called and that she could talk to him after she talked to Russell and Goeman. Defendant was upset and crying throughout the interview on January 27. On the night of the 27th, defendant claims that Russell told her that her release would have to await the prosecutor's return from out of town. Defendant explained that she asked Julie Nowinski to arrange an interview with Russell on the 28th to find out what was going to happen to her. Defendant claims that *Miranda* warnings were not given to her on the 28th and that Russell elicited the second taped statement by telling her that it was Bill Kimmerly they wanted and that Kimmerly would be arrested if she told them the same things she had told them on the 27th.

Rev. John Myette, defendant's minister, testified that he arrived at the sheriff's department on the night of the 27th shortly after being called, and that he waited only briefly before being allowed to speak to defendant. Defendant told Rev. Myette that she tried to speak to him earlier but that the officers had refused to allow it until after she spoke to them. Defendant seemed very upset to Rev. Myette, and she claimed that they (the officers) had shouted and sworn at her. The later statement is inconsistent with defendant's own testimony that only Sgt. Somers yelled and swore at her. In addition, Rev. Myette was not positive that defendant hadn't first made this claim the next day, January 28.

A psychiatrist, Dr. Mark Hinshaw, was called as a defense witness, Dr. Hinshaw testified that defendant was borderline mentally retarded with an IQ of 77 and that she had emotional problems.

Defendant's history allegedly included two childhood rapes and a home characterized by much drinking and fighting. At age 18, defendant was institutionalized in a mental hospital, where she made considerable progress. Defendant met her husband there, and they have two children.

According to Dr. Hinshaw, defendant's intellectual disabilities are such that she will often seem to function at a higher level of understanding than is really true. Defendant's most serious problem, according to Dr. Hinshaw, is her acute anxiety disorder, which is aggravated in high pressure situations and which causes her to have difficulties with time sequences and with appreciating future consequences of present actions. Dr. Hinshaw noted that defendant demonstrates a consistent pattern of doing or saying whatever she thinks will aid in getting her out of her current problems, and Dr. Hinshaw concluded that defendant's actions will be dictated by what will relieve immediate pressure rather than what is in her long-term best interests. In Dr. Hinshaw's opinion, defendant would not understand the consequences of a waiver of rights unless they were explained to her in great detail.

The prosecution called Dr. Newton Jackson, a clinical psychologist on the staff of the center for forensic psychiatry. Dr. Jackson explained that defendant's intelligence was on the borderline between retardation and low normalcy. In Dr. Jackson's opinion, defendant was capable of resisting pressure and voluntarily waiving her rights. Dr. Jackson agreed with Dr. Hinshaw that defendant had difficulty in appreciating future consequences of present actions, that defendant was inclined to take the path of least resistance, and that defendant tended to do what authority figures told her. Dr. Jackson explained that defendant's personality

problems would cause her to lie, engage in manipulative behavior, and otherwise do whatever she thought would best help her to get out of her current problems.

In Dr. Jackson's opinion, defendant could understand the *Miranda* warnings but would not fully understand the potential consequences of waiving her rights without an explanation going beyond the mere recital of those rights. He added, however, that one would almost have to be an attorney to do so. Dr. Jackson concluded from the circumstances surrounding defendant's statements that defendant almost certainly understood that her statements would lead to court proceedings against her. According to Dr. Jackson, once defendant understood that she was a suspect, her natural tendency would be to try to shift the blame for the crimes.

The testimony of both Dr. Hinshaw and Dr. Jackson revealed major inconsistencies between defendant's statements to the doctors and her confessions and testiomony at trial.

On this record, the circuit court's finding that defendant's statements on January 27th were the product of coercion is unsupportable. Only defendant's own testimony supports a finding the the officers shouted or swore at her. Defendant's testimony is totally incredible in view of the numerous inconsistencies in her various statements and because both doctors agreed that defendant would not hesitate to lie if she thought lying would help her. Although defendant was upset at the time she made the statement, it is difficult to see how any person could confess to murder without being upset. The officers' preconceived plan for questioning defendant was merely sound police work and did not render defendant's statements the product of coercion. In light of defendant's conflicting ver-

sions of events, the record does not show that defendant was denied an opportunity to consult with her husband or her minister.

Nothing in the record suggests that defendant was too unintelligent to undestand the *Miranda* warnings or to make a voluntary confession. The testimony of both doctors raises questions about defendant's understanding of the full consequences of a waiver of rights, not defendant's understanding of the rights themselves. Defendant's clever attempt to evade suspicion by contaminating her toenail samples with arsenic demonstrates that defendant was aware that she faced a possible murder prosecution. Defendant was repeatedly informed that she was the prime suspect in the murder investigation, and she demonstrated her understanding of this information by making statements attempting to shift the primary blame for the poisoning to another. These circumstances demonstrate that, despite the question raised by Dr. Hinshaw, defendant understood that she faced serious charges including a murder charge. A confession is not rendered involuntary merely because the defendant fails to understand that a confession is not in her best interest. Further, we agree with the prosecution that the trial court misunderstood Dr. Jackson's testimony. A careful review of the transcript shows no inconsistencies in his testimony; he merely clarified his earlier testimony which had been orchestrated by defense counsel.

Defendant's attempt to shift the blame for the poisonings to Bill Kimmerly, a person against whom there was no evidence other than defendant's confessions, demonstrates that nothing done by the officers deprived defendant of her free will. Defendant testified that, throughout the case, whenever the police asked her to do something she

would do it. She testified that she thought when a police officer comes to your door you have to open it and talk to him. Yet, incongruously, she easily resisted taking the polygraph. Obviously defendant had the ability to make a choice and resist police requests.

It is noted that in her affidavit in support of her motion to suppress, defendant denied being given *Miranda* warnings. When interviewed by Dr. Jackson, defendant remembered being told that if she couldn't afford an attorney, the court would appoint one for her, but she didn't know if she should talk or wait until morning. Defendant's stories regarding Bill Kimmerly's involvement in the crimes, and her version of the police (mis)conduct appear to be embellished with each subsequent telling. After considering all the facts and cicumstances shown in this record, we are left with a definite and firm conviction that the circuit court erred by finding defendant's statements to be involuntary and inadmissible.

Reversed and remanded for further proceedings consistent with this opinion. We retain no jurisdicition.