PEOPLE v BIERI

Docket No. 82497. Submitted March 5, 1986, at Grand Rapids. Decided August 4, 1986. Leave to appeal denied, 428 Mich —.

Michael L. Bieri was convicted of first-degree murder following a jury trial in Huron Circuit Court and was sentenced to life imprisonment, Richard M. Knoblock, J. Defendant appealed. *Held:*

1. The trial court did not err in ruling that a second, written confession by defendant was admissible after finding that an earlier oral confession was inadmissible. Intervening events between the two confessions broke the connection between the first confession, which the trial court ruled was involuntarily made and was the product of coercive circumstances and an unfree will, and the second confession, which was made voluntarily by defendant after his rights were explained to and considered by him sufficiently enough to purge the confession of any taint from the primary statement.

2. The trial court did not abuse its discretion in permitting the impeachment of the credibility of a defense witness, a jail inmate, with evidence of the witness' reputation for truthfulness among county jail employees.

Affirmed.

1. EVIDENCE — CONFESSIONS.

The fact that one confession is found to be inadmissible because it was involuntarily made and was the product of coercive circumstances and an unfree will does not prevent a subsequent confession from being admissible where intervening events between the two confessions break the connection between the confessions and the second confession is voluntarily made by

REFERENCES

Am Jur 2d, Appeal and Error §§ 736 *et seq.*

Am Jur 2d, Evidence §§ 526 *et seq.*

Am Jur 2d, Witnesses §§ 518 *et seq.*

See the annotations in the Index to Annotations under Character and Reputation; Confessions and Admissions; Impeachment of Witnesses.

the defendant after sufficient explanation and consideration of his rights to purge the confession of any taint from the primary statement.

2. EVIDENCE — WITNESSES — IMPEACHMENT.

The rules of evidence allow the impeachment of a witness' credibility by evidence of the witness' reputation for truthfulness or untruthfulness; the admissibility of such evidence is limited and the testimony of a character witness must be based upon what he has heard other people in the subject's residential or business community say about the subject's reputation (MRE 608).

3. APPEAL — EVIDENCE — CHARACTER EVIDENCE.

The Court of Appeals reviews a trial court's decision on the admissibility of character evidence on an abuse-of-discretion standard.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Karl E. Kraus,* Prosecuting Attorney, and *Raymond O. Howd,* Assistant Attorney General, for the people.

State Appellate Defender (by *Stuart B. Lev*), for defendant on appeal.

Before: D. F. WALSH, P.J., and HOOD and K. N. HANSEN,* JJ.

HOOD, J. Defendant appeals as of right from a jury trial conviction for first-degree murder, MCL 750.316; MSA 28.548. The victim, Jerry Western, was shot and killed by a single shotgun blast to the back on the evening of January 22, 1984. It is undisputed that the murder of Western was the result of a conspiracy involving Jane Western, the victim's wife, Ralph Ross, with whom Jane was having an affair, Ila Langley, who worked at Ross' health spa, the defendant and other unknown

---

* Circuit judge, sitting on the Court of Appeals by assignment.

persons.[1] The issue at trial was whether defendant was the actual shooter or whether he played a lesser role in the conspiracy.[2]

The primary issue in this case concerns the admissibility of defendant's April 27, 1984, sworn confession. Sheriff Detective David Neuendorf first contacted defendant on February 17, 1984, before defendant was considered a suspect. At that time, defendant was being questioned by Neuendorf because witnesses had seen defendant on the night of the murder in Ralph Ross' presence and Neuendorf was trying to place Ross' whereabouts at the time of the murder, which was approximately 7:30 P.M. on January 22. Defendant told Neuendorf that he saw Ralph Ross that evening at the Eagle's Club in Caseville at approximately 8:20 P.M. and that he knew of Ross' affair with Jane Western, but had no other information.

Neuendorf's second contact with defendant came on March 22, 1984, after Neuendorf's discussion with Langley in which she implicated defendant. Defendant was definitely a suspect at this time. Before this second meeting, Neuendorf advised defendant of his *Miranda*[3] rights, which defendant waived. The two then talked for forty to forty-five minutes, wherein defendant acknowledged that he

[1] Jane Western was convicted of first-degree murder and conspiracy to commit first-degree murder, Ross was convicted of second-degree murder in exchange for his testimony against Jane Western, and Langley testified against defendant pursuant to an immunity agreement.

[2] We note, however, that although defendant was not charged with conspiracy to commit first-degree murder, his own unchallenged statements made both prior to and after the confession complained of here clearly admit his complicity in the planning of Jerry Western's murder. Under Michigan law, had defendant been charged and convicted of conspiracy to commit first-degree murder instead of first-degree murder itself, he would still have faced mandatory life imprisonment. MCL 750.157a; MSA 28.354(1); *People v Hamp*, 110 Mich App 92, 104-105; 312 NW2d 175 (1981).

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

was deeply involved in the conspiracy to kill Jerry Western. The substance of this March 22 meeting was essentially the same as defendant's testimony in his own behalf at trial.

Defendant, who had known Ralph Ross since childhood, stated that he was approached by Ross on December 31, 1983, and that Ross asked him if he could find someone to kill a man. Defendant said he would check around. Several days later when defendant saw Ross again, Ross told him that he had found somebody to take care of it. Later, defendant took a telephone message for Ross from someone who demanded "one-half of the money down now and the other half when the job is done," and told defendant where he wanted the money dropped off. The voice did not tell defendant when to make the drop, but warned him to "keep your damn mouth shut, or your family will be next."

Defendant stated further that he informed Ross of the substance of the conversation, and the next day Ross gave defendant $2,200 in small bills. Later that evening, either January 4 or 5, 1984, defendant dropped the money off near a bridge, as he had been told to do. Sometime later, defendant purchased a 12-gauge pump shotgun for Ross. Still later, defendant called Jerry Western at Ross' instruction and made an appointment to meet Western to look at a horse Western wanted to sell. Defendant testified at trial, and indicated in his March 22 statement, that it was his understanding that that was the entire part that he would play in this scheme, and that he was not really going to go to the Western farm to meet with Western.

Defendant stated that Ralph Ross called defendant again on January 18, 1984, and said that it "didn't go down" on January 17 as planned because of Jackie Western's birthday. Apparently,

Jane Western had asked Ross to wait until after her daughter's birthday for the murder to take place. Ross instructed defendant to make another appointment with Western for 7:00 P.M. on January 22, 1984. Defendant made arrangements to pick Western up and go with him to look at the horse.

At this point, defendant's March 22, 1984, statement to Detective Neuendorf differs from his trial statement. In his statement at the police station, defendant told Neuendorf that he did not go out to the Western farm that evening and did not see Jerry Western at all that night, but saw Ralph Ross later. He said that he met Ross at a bar later in the evening, that Ross told him it was "done," and that Ross gave him $2,300 and told him to drop it off in the same place where he had left the previous payment. Defendant told Neuendorf that he dropped the money off as told and did not know the identity of the unknown caller on the pay telephone nor the identity of the shooter.

Neuendorf testified that during the course of this statement defendant was calm at first, but cried toward the end. Later in the day, defendant showed Neuendorf where the dropoff point was. Neuendorf felt that, at this time, defendant was being sincere and had fully divulged his entire participation in the murder. Following this conversation, Neuendorf requested that an attorney be appointed for defendant, and Thomas Collon was appointed to represent defendant. After talking with the attorney, defendant made a sworn statement that is consistent with defendant's trial testimony to this point.

Following the March 22 statement, defendant was offered immunity from prosecution in exchange for his cooperation in the investigation. Conditions of that agreement were that defendant

must take and pass a polygraph examination as to the truthfulness of the March 22 statement, that he be truthful with the police at all times and that he testify against those eventually prosecuted. It was further understood that this immunity agreement would be withdrawn if it were found that defendant knew the identity of or was himself the shooter.

As noted above, defendant's trial testimony differs from the March 22, 1984, statement from this point on. At trial, defendant testified he met Ross at 6:55 P.M. on January 22, 1984, and drove him to the "west pit," where Jerry Western kept his horses. Defendant dropped Ross off and Ross took the gun out of the back seat of defendant's car. Defendant then met Western and drove him to the pit, where defendant shut off the car and lights.

Western got out of the car and walked toward the gate. As defendant was getting out of the car, he heard a gun blast come from his side of the car. He did not see who fired the gun, but testified that someone told him to go to the Eagle's Club in Caseville and wait for him. Defendant presumed that this was Ralph Ross, although he did not actually see the man's face. The man also threw the gun into defendant's car. Later, at the Eagle's Club, Ross told defendant it was "all over," gave defendant the money, and told him to drop it off at the bridge site. Defendant testified that he did so and did not see Ross again until February, 1984. Defendant added that on March 22, 1984, he was afraid to tell Neuendorf who the shooter was because Ross had threatened him and his family.

Detective Neuendorf's next contact with defendant was on March 25, 1984. Defendant called Neuendorf at his home and told him that his family had been threatened by a telephone caller. Two days later, on March 27, 1984, Detective

Neuendorf saw defendant at defendant's home, at defendant's request. Defendant then told the officer that the day before Ross had been to his house and left a message with his babysitter for him to meet Ross on the 27th at a nearby lumber yard. Defendant went to that meeting and said that Ross had threatened defendant and his family.

On April 26, 1984, Detective Neuendorf called defendant and asked defendant to contact him the next day in order to discuss the Western case. Neuendorf believed that defendant knew more than he had related in his March 22, 1984, statement, but did not at that point believe that defendant was the shooter. On April 27, Neuendorf first called defendant's appointed counsel, Thomas Collon, and informed him of his intention to contact defendant.

Neuendorf testified that Collon said that he had no objection to his client's being questioned and put no conditions on the meeting. Collon testified, however, that it was his understanding that defendant was to be brought to his office for counsel before questioning. He had been appointed to the case on March 22 and had had no subsequent contact with defendant. Neuendorf picked defendant up at his home and, rather than drive back to the station as the two had done in the past when they spoke about the case, he drove defendant in his unmarked car to a deserted beach.

Before questioning, Neuendorf recited defendant's *Miranda* rights and told defendant that his lawyer was available if he wished him to be present. Neuendorf also told defendant, however, that his lawyer had said it was all right to talk and that he had no objection to the meeting. Defendant then waived his rights and agreed to talk. Neuendorf told him that he did not believe defendant was being completely truthful with him, that he

thought defendant knew who the shooter was and that defendant's immunity might therefore be in jeopardy. Neuendorf testified that he made no promise of leniency or immunity to defendant during this conversation, but told defendant that he knew something was "eating at [his] guts" and that he should be truthful.

Much to Neuendorf's surprise, defendant then confessed to the murder of Jerry Western and told Neuendorf that the murder weapon was still in the trunk of his car. Neuendorf immediately radioed the police station and asked that defendant's attorney, the sheriff, the prosecutor, and other investigating officers be called to the station. Defendant told Neuendorf that he killed Jerry Western because Ralph Ross had threatened defendant's family.

Neuendorf then drove defendant back to the sheriff's department, where Collon, the prosecutor, and other officers were waiting. While Collon talked privately with defendant, Neuendorf told the others about the promises he made to defendant and it was agreed that they would be honored. These promises involved holding defendant in protective custody over the weekend, but allowing him to attend his wife's grandmother's funeral and not informing his wife of his arrest until she had taken an important college examination the following Monday. The prosecutor also talked with Collon and told him there would be "no deals" in exchange for a sworn confession.

The record is unclear as to exactly how long Collon discussed the case with defendant before a sworn statement was taken, but it appears that two to three hours passed between defendant's arrival at the station and the taking of the statement. During that time, defendant spoke to Collon several times. Collon advised defendant not to

make a statement, but "quite a bit later" defendant proceeded to do so, contrary to that advice. Collon testified that the prosecutor was emphatic that there would be no reduced charge offered and that Collon explained this to defendant before his statement.

Defendant's sworn confession, which was eventually admitted at trial, was then taken in the presence of six people after a waiver of *Miranda* rights and after defendant acknowledged that no deals or promises had been made and that his attorney had advised him against making the statement. His statement was essentially the same as the one he made at trial except that defendant stated that he picked up Jerry Western alone, drove him to the pit, and shot him in the back as Western was unlatching the gate in the driveway. It should be noted that the shotgun taken from defendant's car was never linked with any scientific certainty to the gunshot that killed Jerry Western.

Defendant first recanted his confession that he was the triggerman on May 20, 1984, while he was an inmate at the county jail. At that time, he stated that Ralph Ross was the shooter. At the *Walker*[4] hearing held on August 15, 1984, defendant indicated that he originally spoke with Neuendorf at the beach because it was his understanding that his attorney had approved of the talk and that he thought he would lose his immunity if he did not talk. He said he confessed because he was afraid he had been seen talking to the police and he thought his family was in danger.

As to the subsequent sworn statement at the police station, defendant said that he cooperated

[4] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

because he thought he would get immunity or a lesser charge and because the prosecutor told him that this would not be so only after the statement was recorded. He further testified that if he had not already confessed at the beach, he would not have gone to the station with Neuendorf and would not have executed a consent to search his automobile. Neuendorf agreed that, had defendant not confessed at the beach, he would have been taken back to his home and released. At trial, defendant explained that he confessed to being the shooter on April 27 because he was afraid someone saw Detective Neuendorf come to his home and that he knew Ralph Ross was still at large and that he feared for his family's safety.

Following the *Walker* hearing, where only the two April 27 confessions were challenged, the trial court ruled that defendant's first confession was inadmissible, apparently because the court viewed the questioning in the patrol car, the confusion over the availability and advice of defendant's counsel, and the status of defendant's immunity as inherently coercive. However, the court refused to suppress defendant's second confession, stating:

> All of the above-enumerated considerations which tainted the earlier confession were absent; defendant was afforded counsel, any coerciveness of the environment in which defendant made the statement was removed, defendant was clearly advised of the fact that the offer of immunity was withdrawn and he was unequivocally advised that there would be "no deals". Additionally, a period of approximately three hours passed during which defendant had an opportunity to confer with counsel and to reflect on his decision to confess. It is the opinion of this court that this constituted a sufficient turn of events to vitiate any interference with the defendant's ability to exercise his free will and therefore his decision to make the sworn

statement and to consent to search his vehicle, both against the advice of his attorney, was freely and voluntarily made.

For these reasons, defendant's motion to suppress the sworn statement given on April 27, 1984, is denied.

Defendant now contends that the trial court erred in admitting the second confession because it was solely derivative from the first statement, which the court correctly ruled was involuntarily made. Defendant submits that the trial court failed to properly assess the impact of the first statement, the pressure he was under, and the inadequate advice of counsel. Defendant asserts that the trial court failed to consider the "cat out of the bag" effect that defendant's first confession had upon his free will.

Defendant's "cat out of the bag" theory was recently discussed at length by the United States Supreme Court in *Oregon v Elstad,* 470 US 298; 105 S Ct 1285; 84 L Ed 2d 222 (1985). *Elstad* involved an initial inadmissible statement that was not coercively induced, but was made without the prerequisite *Miranda* warnings. The statement was followed approximately one hour later by defendant's waiver of his *Miranda* rights and his execution of a full, written confession. Justice O'Connor, writing for the majority and citing *United States v Bayer,* 331 US 532; 67 S Ct 1394; 91 L Ed 1654 (1947), recognized the theory advanced by the defendant in this case, stating:

The Oregon court nevertheless identified a subtle form of lingering compulsion, the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate. But endowing the psychological effects of *voluntary* unwarned admissions with con-

stitutional implications would, practically speaking, disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confessions. As the Court remarked in *Bayer:*

"[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession may always be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." 331 US at 540-541 [91 L Ed 1654, 67 S Ct 1394. 470 US 311.]

The majority in *Elstad* reversed the decision of the Oregon Court of Appeals that the second confession was inadmissible and held that any coercive effect from the earlier voluntary, but unwarned, admission by the suspect should not render the second statement inadmissible. Defendant in the instant case points out that the holding in *Elstad* did not apply to circumstances where the initial confession was made involuntarily, without a "free and unconstrained" will, in violation of due process. 84 L Ed 2d 229, 231, 232-233. Defendant contends that the trial court gave little, if any, weight to the psychological effect of defendant's inadmissible prior statement that he shot Western.

Defendant contends that, even though the trial court never precisely stated why it had found that the first statement should be suppressed, it is clear that the court held that the first statement was involuntarily made and was the product of coercive circumstances and an unfree will. For the

moment assuming arguendo that defendant's premise that the first statement was involuntarily made is correct and assuming that the trial court's decision to suppress the first statement was also correct, we must determine whether the psychological effect of the first statement has been purged by the circumstances surrounding the second statement. Defendant contends that the totality of the circumstances show that the second confession was a direct product of the first. We do not agree.

Instead, we agree with the trial court that the intervening events between the two confessions broke the connection between the confessions and the second confession was voluntarily made by defendant after sufficient explanation and consideration of his rights to purge the confession of any taint from the primary statement. Our foremost consideration in reaching this conclusion is the defendant's consultation with counsel between the first and second confessions. Even if defendant did not fully understand his right against self-incrimination before making his oral statement at the beach, the facts demonstrate that his attorney provided him with sufficient information to enable him to exercise an intelligent waiver of rights prior to making the stationhouse confession.

At the police station, defendant was counseled by his attorney to neither make a second statement nor execute a consent to search his automobile. He had been advised that the prosecutor would make no deals. Defendant still wished to make the second statement. It would be completely unreasonable to believe that defendant thought the immunity agreement still applied when he knew one of the conditions of that agreement was that he was not the shooter. He was advised of his *Miranda* rights prior to making the written confession. Three hours had passed since

he made his oral statement. He gave his written statement at the sheriff's department, while his attorney was present.

Defendant argues that his second confession should have been suppressed because his attorney never advised him that his oral statement could be suppressed and not used against him. Defendant claims that without this advice, counsel's intervention could not break the psychological effect of the initial statement. Justice O'Connor, responding to a similar argument in *Elstad,* said:

> This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness. See *California v Beheler,* 463 US —, at —, n 3, 77 L Ed 2d 1275, 103 S Ct 3517; *McMann v Richardson,* 397 US 759, 769, 25 L Ed 2d 763, 90 S Ct 1441 (1970).
>
> \*    \*    \*
>
> Likewise, in *California v Beheler, supra,* . . . the Court declined to accept defendant's contention that, because he was unaware of the potential adverse consequences of statements he made to the police, his participation in the interview was involuntary. Thus we have not held that the sine qua non for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case. [Citation omitted. 84 L Ed 2d 237.]

The *Elstad* Court, eschewing a bright line rule where the initial statement is suppressed, concluded:

> Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant in-

quiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. [470 US 318.]

In this case, we are not persuaded that the defendant's first confession was the product of coercion. While defendant offers a panoply of reasons as to why the first confession was coerced, and completely tainted his subsequent written confession, none of these reasons involve police coercion. Some circumstances, other than defendant's subjective description of his mental state, must appear in order to show that a confession was coerced. Reversing a circuit court's determination that a confession was coerced, this Court recently said in *People v Belknap,* 146 Mich App 239, 247-248; 379 NW2d 437 (1985):

Only defendant's own testimony supports a finding [that] the officers shouted or swore at her. Defendant's testimony is totally incredible in view of the numerous inconsistencies in her various statements and because both doctors agreed that defendant would not hesitate to lie if she thought lying would help her. Although defendant was upset at the time she made the statement, it is difficult to see how any person could confess to murder without being upset. The officers' preconceived plan for questioning defendant was merely sound police work and did not render defendant's statements the product of coercion. In light of defendant's conflicting versions of events, the record does not show that defendant was denied an opportunity to consult with her husband or her minister.

While the facts in *Belknap* are different from the facts in this case, the legal reasoning contained therein is equally applicable. Only the testimony of the defendant, which was inconsistent at best, would substantiate his claims that he feared for his family's safety, that he felt pressured to be present at the funeral home for his wife's grandmother's funeral, that he thought that immunity would still be granted, and that he experienced psychological pressure, all of which culminated in his confessing to the murder. As to the grant of immunity, defendant could not possibly have reasonably believed that such an agreement ever existed since he knew at the time the agreement was proposed that his statements could not be corroborated, that they were not the truth, and that he was in fact the shooter.

Moreover, defendant admitted within the body of his sworn statement that no promises were made to him, that he was not threatened or coerced, and that he did not feel in any way compelled to make the statement and knew he was making the statement contrary to his counsel's advice. He stated on the record that he made the statement in order to clear his conscience. Indeed, at the *Walker* hearing, defendant testified that at the police station, "I figured I could walk out if I wanted to. They didn't say I was under arrest." Taking all the circumstances and intervening events into consideration, we conclude that defendant's second statement was voluntarily given for whatever subjective reasons defendant may have had.

Thus, our review of the entire record leads us to conclude that the trial court did not err in determining that defendant's second confession was made voluntarily. We are not left with the definite

and firm conviction that a mistake has been made, and this issue affords defendant no relief.

Defendant's other claim of error is that the trial court erroneously allowed the impeachment of defense witness Ronald Miller with evidence of the witness' reputation for truthfulness among county jail employees. Miller served time in jail with Ralph Ross and testified that, while in jail, Ross admitted that he shot Jerry Western.[5] In rebuttal, the prosecutor was allowed to call Deputy Sheriff Richard Koehler, a county jail correctional officer, who testified that Miller had a bad reputation for truthfulness among county jail employees.

Defendant contends that while MRE 608 allows impeachment of a witness' credibility by evidence of reputation for untruthfulness, Koehler's testimony was improperly admitted for three reasons. First, Koehler's knowledge of Miller's reputation did not extend beyond the walls of the county jail. The jail setting is not Miller's "community." Second, Miller had not spent enough time in jail to establish a reputation. Finally, defendant argues that jail employees are generally antagonistic toward inmates and do not have the level of objectivity that makes reputation evidence reliable.

The instant question is one of first impression. MRE 608 allows the impeachment of a witness' credibility by evidence of the witness' reputation for truthfulness or untruthfulness. The admissibility of such evidence is limited and the testimony of a character witness must be based upon what he has heard other people in the subject's residential or business community say about the subject's reputation. *People v Morrin,* 31 Mich App 301, 336; 187 NW2d 434 (1971), lv den 385 Mich 775 (1971). We review the trial court's decision on the

[5] Neither Ross nor Jane Western testified at defendant's trial.

admissibility of such character evidence on an abuse-of-discretion standard. *People v Adams,* 122 Mich App 759, 765-766; 333 NW2d 538 (1983), rev'd 421 Mich 865 (1985) (finding no abuse of discretion, but not altering the standard of review). Our review of the impeachment of Ronald Miller in this case persuades us that the trial court did not abuse its discretion.

We conclude that Koehler's testimony that he had known Miller as an inmate in the Huron County jail for five months and had become acquainted with his reputation for truthfulness during that time was sufficient to permit Koehler to offer his testimony that Miller's "reputation as a liar is quite outstanding." It was not until Koehler indicated that Miller's reputation had been discussed among the correctional officers and jail employees that the trial court allowed Koehler to testify. We disagree with defendant that the jail should not be considered Miller's "community" and that five months is insufficient time to establish a reputation. One's community can be either where one lives or works, and a reputation may be established wherever one interacts with others over a period of time.

Defendant also contends that because jail employees are often antagonistic toward inmates, the potential for bias is too high to permit such testimony. However, when Koehler finally testified before the jury, the limited basis of his knowledge was adequately brought out on cross-examination. Koehler admitted that he was familiar with no one who knew Miller outside of the jail and that he did not know of Miller's reputation for truth and veracity outside of the jail setting. We conclude that the jury was competent to give this testimony its proper weight, after considering Koehler's limited knowledge of Miller and taking into account

the fact that the relationship between Miller and the jail employees was not based upon normal social or professional contacts. Looking at Koehler's testimony as a whole, the trial court did not abuse its discretion in admitting it to impeach Miller.

Defendant's conviction is affirmed.